UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                :
KATELIN NOFFSINGER,             :  No. 3:16CV1938(JAM)
                                :
              Plaintiff         :
                                :
         vs.                    :
                                :
SSN OPERATING COMPANY LLC d/b/a :
BRIDE BROOK NURSING &           :
REHABILITATION CENTER,          :
                                :  New Haven, Connecticut
              Defendant         :  April 25, 2017
                                :
- - - - - - - - - - - - - - - - x
```

MOTION HEARING

B E F O R E:

    THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

A P P E A R A N C E S:

    FOR THE PLAINTIFF:

        LIVINGSTON, ADLER, PULDA, MEIKLEJOHN & KELLY
            557 Prospect Avenue
            West Hartford, Connecticut 06105
        BY:  HENRY F. MURRAY, ESQ.
            ZACHARY L. RUBIN, ESQ.

    FOR THE DEFENDANT:

        GORDON & REES LLP
            95 Glastonbury Boulevard, Suite 206
            Glastonbury, Connecticut 06033
        BY:  THOMAS C. BLATCHLEY, ESQ.

                        Diana Huntington, RDR, CRR
                        Official Court Reporter

1                          **4:05 P.M.**

2               THE COURT:  We're here today for purposes of

3     argument on motions in the matter of Noffsinger vs. SSN

4     Operating Company, 16CV1938.

5               May I have appearance of counsel, please?

6               MR. MURRAY:  Yes, Your Honor.  Henry F. Murray

7     for the plaintiff along with Zachary Rubin.

8               THE COURT:  Good afternoon.

9               MR. BLATCHLEY:  Good afternoon, Your Honor.  Tom

10    Blatchley for the defendant.

11              THE COURT:  Okay, great.

12              I guess we have students as well from Quinnipiac

13    University Law School, welcome.

14              Professor Saxton, are you okay back there?  Do

15    you want a closer seat or anything like that?

16              PROFESSOR SAXTON:  We're fine, Your Honor.  Much

17    obliged.

18              THE COURT:  I guess, Mr. Blatchley, since this

19    is your motion, if you'd like to start.

20              MR. BLATCHLEY:  Thank you, Your Honor.

21              Plaintiff Katelin Noffsinger instituted this

22    action under the Connecticut Palliative Use of Marijuana

23    Act, C.G.S. 21a-408, et seq.  She alleges in her complaint

24    that she's protected by -- for the Court's clarity, I use

25    the acronym PUMA, if that's acceptable to the Court, or

1    Act.

2              THE COURT:  Okay.

3              MR. BLATCHLEY:  Plaintiff alleges in her

4    complaint that she is protected by the PUMA and that

5    defendant's refusal to hire her, who tested positive for

6    marijuana during the pre-application employment process,

7    constitutes a violation of the PUMA.

8              THE COURT:  Any chance, Mr. Blatchley, you can

9    come on up to the lectern?  I'll be able to hear you a

10   little bit better with the microphone.  Thanks.

11             MR. BLATCHLEY:  We believe that this action must

12   be dismissed with prejudice.  PUMA authorizes the

13   affirmative use, sale, possession, cultivation and

14   distribution of medical marijuana in the state of

15   Connecticut, which actions are illegal under the federal

16   Controlled Substances Act.  We believe the PUMA's

17   affirmative authorization of medical marijuana is an

18   obstacle to the accomplishment and execution and purposes

19   and objectives of federal law, including the Controlled

20   Substances Act, the Americans with Disabilities Act,

21   and the --

22             THE COURT:  So do I have to look at the entire

23   statute here or do I just look at the particular part that

24   regulates what employers may not do?  Do you understand

25   the distinction I'm talking about?

1           MR. BLATCHLEY:  I do.  I think it applies to

2    both, Your Honor.

3           THE COURT:  Why is that?  Because it seems to me

4    that the protection that's cited here in the statute by

5    plaintiff is specific to this particular provision of the

6    statute.  So what I should look at is whether this

7    particular provision is in some way inconsistent with or

8    preempted by one or more federal laws rather than looking

9    at provisions of the statute that are not actually at

10   issue in this case; isn't that right?

11          MR. BLATCHLEY:  You're right, Your Honor.  I

12   think that what the plaintiff is focusing on is

13   Section 21a-408p which deals with the employment.

14          THE COURT:  So if we can, let's try to focus the

15   discussion on just that provision --

16          MR. BLATCHLEY:  Okay.

17          THE COURT:  -- and how you believe that's

18   inconsistent with the Controlled Substances Act or the ADA

19   or FDA rather than trying to look at other provisions of

20   the statute that don't seem to be really at issue here.

21          MR. BLATCHLEY:  Okay.

22          THE COURT:  Because it would be one thing if the

23   U.S. Attorney General had come in and essentially taken a

24   declaratory action for the whole statute.  But that seems

25   to me that what you're looking at here is one very

1   particular provision.

2           MR. BLATCHLEY:  Okay, Your Honor.  And I think

3   my argument and the arguments in our papers still apply,

4   whether we're looking at the whole Act itself or we'll

5   home in on this particular provision.

6           The CSA preempts the PUMA Section 21a-408p which

7   governs employment.  And the CSA is a regulatory system

8   designed to eliminate the manufacture, sale, trade,

9   dispensing of marijuana.  And Congress enacted the CSA to

10  conquer drug abuse and control illegitimate drugs.  That's

11  been widely argued.  The federal courts all recognize --

12          THE COURT:  Absolutely does.

13          What does the CSA say about employment?  How is

14  it that the CSA regulates the employment relationship?

15          MR. BLATCHLEY:  Well, we believe that the CSA

16  in this case, the particular section at issue, directs the

17  employers to basically authorize the use or allow medical

18  marijuana in the workplace.  And we believe --

19          THE COURT:  Is that what's at issue in the case,

20  the use of medical marijuana?  Maybe I misunderstood the

21  facts.  It sounded to me like the issue was whether

22  plaintiff would be permitted, as allowed under the

23  Connecticut law, to use medical marijuana outside of the

24  workplace late at night, just before she goes to bed, when

25  she's long off work, no evidence, according to plaintiff,

1   that it would affect adversely in any way her work

2   performance.

3          MR. BLATCHLEY:  That's correct, Your Honor.  The

4   PUMA section at issue doesn't simply decriminalize

5   marijuana, it authorizes it as a qualifying patient.  So

6   in this case if Ms. Noffsinger were a qualifying patient

7   under the statutes or regulations, can use it outside the

8   workplace; it can't be used inside the workplace.

9          Under the CSA, it's an impermissible obstacle to

10  the basic purpose of the CSA.  Plaintiff can't be in

11  compliance with the CSA when engaged in PUMA-authorized

12  conduct.  The section at issue in PUMA itself authorizes

13  exactly what the CSA prohibits: marijuana use and

14  possession.  And plaintiff here doesn't merely seek state

15  law immunity for her marijuana use; rather, she seeks to

16  affirmatively require defendant Bride Brook to accommodate

17  her marijuana use.

18          THE COURT:  How is the defendant being required

19  to accommodate the use when in fact she's not using it at

20  the workplace?

21          MR. BLATCHLEY:  Because the section at issue

22  would force any defendant in Connecticut under this Act,

23  particular section at issue would force the defendant

24  employer to hire somebody who is in violation of the law.

25  The *Garcia* case that we cited in our reply brief, it's --

1          THE COURT:  I read *Garcia*.  I read that.  I

2    would say I'm not sure I was as persuaded by the reasoning

3    there because it seems to me it might approve too much.

4    In a way, suppose you had a statute that the --

5    everybody's required under federal law to file tax

6    returns, we know that this season, right?  And what if a

7    statute came along and the state statute said, well, no

8    employer may refuse to hire somebody simply on the basis

9    that they have not timely filed their tax returns.  In

10   that case, would you say, well, that's preempted because

11   the federal purpose is to get people to file their tax

12   returns?  Is that what you're saying?  You're saying

13   essentially that no state -- no state statute can ever

14   give protection to employees who are at some point, maybe

15   well off the job, violating some federal law?

16          MR. BLATCHLEY:  I think in limited

17   circumstances, as recognized in *Garcia*, it can

18   decriminalize the use.  But in terms of forcing the

19   employer, it seems to run afoul of the Controlled

20   Substances Act, Americans with Disabilities Act, and the

21   Food, Drug, and Cosmetic Act to require the employer to,

22   in this case, employ somebody in violation --

23          THE COURT:  What if the state said no employer

24   may refuse to hire somebody because they drove their car

25   in violation of the federal speed limit on the interstate

1    highway on the way to work or on the way to the job

2    interview?  Would you be here saying, well, that's

3    preempted?  A state can't regulate the employment

4    relationship in that way because that in some way detracts

5    from the federal purposes, to promote people who don't

6    speed on the interstate highway.

7              MR. BLATCHLEY:  I don't know, Your Honor.

8    That's a hypothetical, that's a good hypothetical.  But,

9    you know, the drug problem is something that's confronted

10   the United States and the courts and has plagued the

11   courts, and it's been a policy of the U.S. Government,

12   Congress to try to regulate that.

13             THE COURT:  What do I make of the provision of

14   the CSA that limits preemption to only when there's a

15   positive conflict?  That's the term that's used in the

16   CSA.  How is there a positive conflict here by the state

17   deciding that an employer should not refuse to hire

18   somebody simply because at some point they're using

19   illegal drugs off the job?

20             MR. BLATCHLEY:  I'd respond by saying it's

21   affirmatively requiring the use of medical marijuana or

22   marijuana in this case when it's actually banned under

23   federal law.

24             THE COURT:  Is it affirmatively requiring it?

25   It's just the employer is saying the employer may not

1    refuse to hire.

2              MR. BLATCHLEY:  It's affirmatively requiring

3    Bride Brook or any defendant employer in this state under

4    the current version to hire an employee who is a

5    qualifying patient under the Act.

6              THE COURT:  Okay.  So the rule that you want me

7    to draw then I think for the purposes of the case is no

8    state may condition or have an employment condition that

9    prohibits an employer from discharging or refusing to hire

10   somebody on the basis of their violation of any federal

11   law.

12             MR. BLATCHLEY:  That's right, Your Honor.

13             THE COURT:  Okay.

14             MR. BLATCHLEY:  I touched upon the CSA.

15             The ADA doesn't require employers to accommodate

16   illegal activity.  And expressly permits employees to drug

17   test and to make employment decisions based on those drug

18   tests.  The PUMA section at issue undermines employers'

19   rights under the ADA to treat illegal drug users using the

20   same --

21             THE COURT:  So what provision of the ADA are you

22   referring to in terms of it expressly allows for drug

23   tests?

24             MR. BLATCHLEY:  If I may, can I retrieve --

25             THE COURT:  Sure, sure.

1          MR. BLATCHLEY:  It's in the reply brief,

2    Your Honor, page 5, 42 U.S.C. Section 12114(a).

3          THE COURT:  Okay.  I don't see that (a) -- I

4    have (a) in front of me right here.  I don't see that it

5    deals with drug testing.

6          MR. BLATCHLEY:  Subsection (a).

7          THE COURT:  It says, "For purposes of this

8    subchapter, a qualified individual with a disability shall

9    not include any employee or applicant who is currently

10   engaging in the illegal use of drugs, when the covered

11   entity acts on the basis of such use."  Do you know if

12   that refers to drug testing?

13         MR. BLATCHLEY:  I may have a miscitation.  We

14   had quoted "Nothing in this subchapter shall be construed

15   to...prohibit...the conducting of drug testing for the

16   illegal use of drugs by job applicants or employees or

17   making employment decisions based on such test results."

18         THE COURT:  That's sub-part (d)(2) --

19         MR. BLATCHLEY:  Yes.

20         THE COURT:  -- that says that.  Okay.

21         And that's at page 5?

22         MR. BLATCHLEY:  Yes, Your Honor.  Document 32,

23   page 5.

24         THE COURT:  And I see there's some ellipses

25   around the term "prohibit."  Do you know what the words

1    are that are missing there?

2              MR. BLATCHLEY:  I don't, Your Honor.

3              THE COURT:  Did you know that the words are, it

4    fully says "Nothing in this subchapter shall be construed

5    to encourage, prohibit, or authorize the conducting of

6    drug testing..."  Is that a different meaning then to

7    that term?

8              MR. BLATCHLEY:  Yes, it does, Your Honor.

9              THE COURT:  It seems to me what the ADA is

10   saying it's basically indifferent to whether employers

11   engage in drug testing.  It's not essentially saying, as I

12   think I read the portion of the brief as saying, well,

13   it's actually telling employers or suggesting employers

14   should drug test.

15             MR. BLATCHLEY:  Bear with me, Your Honor.

16                  (Pause.)

17             MR. BLATCHLEY:  We'd also argue at page 20 of

18   the brief that in connection with ADA, the provision

19   applicable, the employment provision of the PUMA conflicts

20   with the ADA's authorization of employers to hold illegal

21   drug users to the same standards it would apply to other

22   employees.  And therefore we believe there would be an

23   obstacle to enforce the federal law.

24             THE COURT:  What do you make of the savings

25   clause of the ADA that provides that in the ADA -- it's 42

1   U.S.C. 12201(b).  I don't know if you're aware of that

2   provision.  I don't know if you have a copy of the ADA

3   with you.

4              MR. BLATCHLEY:  I don't have a copy with me,

5   Your Honor.

6              THE COURT:  Well, the language of that provision

7   says that "Nothing in this chapter shall be construed to

8   invalidate or limit the remedies, rights, and procedures

9   of any Federal law or law of any State or political

10  subdivision of any State or jurisdiction that provides

11  greater or equal protection for the rights of individuals

12  with disabilities that are afforded by this chapter."

13             So it seems to me that I have to be a little bit

14  concerned about that statutory provision insofar as it

15  seems to suggest that it gives room for states to be more

16  protective of the rights of individuals with disabilities.

17  And I think that we have somebody here just to qualify for

18  the protection under PUMA has to be defined as having a

19  disability.

20             MR. BLATCHLEY:  You're right, Your Honor.  And

21  I'm not trying to disrate the claimed disability here.  I

22  think there's a distinction though between disability that

23  the plaintiff alleges versus whether she has to use

24  marijuana medical or some other treatment, particularly in

25  light of the federal laws and the federal ban on

1    controlled substances.

2         THE COURT:  Okay.

3         MR. BLATCHLEY:  So in our brief we highlighted

4    the CSA, the FCPA and the ADA in terms of the basis and

5    reasoning why we didn't believe.  We believe the Act or

6    the PUMA section at issue is preempted.  Putting that

7    aside, we still don't believe that the plaintiff sets

8    forth a valid cause of action under Rule 12(b)(6).  We

9    don't think that the PUMA section at issue even provides a

10   right of action.  There are other employment statutes that

11   we cite in our reply brief where actual statutes,

12   particularly within the employment context, afford or set

13   forth -- expressly set forth the rights and remedies of

14   the plaintiff.  Here it hasn't been done.  This is a

15   statute that was carved out the past few years ago by the

16   Connecticut General Assembly and it really deals with

17   licensing, dispensing, cultivation of marijuana, medical

18   marijuana to be specific, in the state of Connecticut.

19        THE COURT:  So what was the legislature's intent

20   with this statute?  Was it just to have verbiage or was it

21   to give it some enforcement?

22        MR. BLATCHLEY:  We don't believe that it was to

23   have any enforcement.  We believe that there may be, you

24   know, a right that deals with employment, but it's more --

25   the statute itself or the Act itself --

1          THE COURT:  It's kind of an aspiration?  Just

2    not meant to have any kind of a real effect under law?  Is

3    there any enforcement mechanism for this?

4          MR. BLATCHLEY:  We don't believe that it creates

5    a private right of action or has an enforcement -- I think

6    the enforcement mechanism is through the Department of

7    Consumer Protection.  If you look at the regulation and

8    the statute itself, or the Act itself, the Department of

9    Consumer Protection is charged with the oversight,

10   investigation, enforcement.

11         THE COURT:  I have looked at it.  It didn't

12   strike me that there was any provision in the statute

13   regarding the DCP's enforcement of this particular part of

14   the statute 408p(3).  Am I mistaken about that?

15         MR. BLATCHLEY:  It doesn't specifically mention

16   it, but I think from the Act itself that's how we

17   interpret it, that it's the DCP has that full oversight

18   and control.

19         THE COURT:  What's the DCP say?  They're an

20   agency.  Have they said anything about whether they have

21   the authority to file suit or otherwise enforce the

22   provisions of this chapter?

23         MR. BLATCHLEY:  I'm not aware of anything,

24   Your Honor.  In fact, I believe -- researching these

25   issues and the Act itself, there's no case law on the Act

1  itself, even though it's been around for several years.

2          THE COURT:  But the DCP, I gather, has

3  promulgated regulations?

4          MR. BLATCHLEY:  The DCP has promulgated

5  regulations.

6          THE COURT:  So what do those regulations say

7  about the DCP's enforcement specifically of the statutory

8  provision here, 408p(3)?

9          MR. BLATCHLEY:  I did not see anything that

10  specifically governed 408p.

11          THE COURT:  -p(3)?

12          MR. BLATCHLEY:  -p(3), Your Honor.

13          THE COURT:  So would it be a fair inference that

14  the DCP does not have authority then, it does not

15  recognize its own authority to enforce 408p(3)?

16          MR. BLATCHLEY:  Possibly, Your Honor.  It could

17  be that just the regulations haven't been developed.  The

18  regulations themselves, everything on the regulations

19  relates to the DCP.  I don't know if the DCP has created

20  regulations on every section within the Act itself.  The

21  Act deals with a lot of different items in terms of --

22          THE COURT:  Do you know of any indication that

23  the DCP has itself initiated any kind of lawsuit ever to

24  enforce any of the provisions of 408p(3) as they relate

25  obviously to employers, to landlords?

```
 1            MR. BLATCHLEY:  I'm not aware of any,

 2    Your Honor.

 3            THE COURT:  So if I were to conclude that in

 4    view that the DCP has never initiated a lawsuit and

 5    doesn't seem to address it at all in its regulations and

 6    that it's the Consumer Protection Department and not the

 7    Department of Labor that actually deals with employment

 8    issues, that there is no administrative enforcement

 9    mechanism in the statute, should that change my conclusion

10    about whether there's a private cause of action?

11            MR. BLATCHLEY:  I don't think it should change

12    that, Your Honor.  I still don't believe that it's

13    specifically called out within the 21a-408p(3) itself.

14    There are other employment statutes.

15            THE COURT:  Well, that's not dispositive,

16    though, is it?  The fact that -- it's common ground that

17    the statute itself doesn't have express language there,

18    but don't I have to look at the factors under Napoletano,

19    the three factors?

20            MR. BLATCHLEY:  Yes, yes.

21            THE COURT:  Isn't one of them whether or not

22    there's essentially an alternative enforcement mechanism?

23            MR. BLATCHLEY:  Yes, Your Honor.  But I don't

24    that believe that every statute provides a cause of

25    action.  People may argue that different statutes have
```

1    causes of action.  But I don't think just because there

2    aren't regulations concerning that statute or it doesn't

3    expressly say it impliedly means that there's a cause of

4    action under the statute, whereas there are other

5    employment statutes that we cite that are specific.  The

6    legislature usually says what it means, it means what it

7    says.  And in this case it didn't specifically call out

8    any relief or provide a cause of action under the --

9              THE COURT:  But I guess my question was:  Under

10   *Napoletano*, the only reason *Napoletano* applies, right, the

11   only reason courts would ever look to that is when the

12   legislature has done what you're saying, that they haven't

13   actually provided for a cause of action, right?

14             MR. BLATCHLEY:  Correct.

15             THE COURT:  So my task is not over simply

16   because there's no language where the legislature created

17   a cause of action; do you agree with that?

18             MR. BLATCHLEY:  I agree with you, Your Honor.

19             THE COURT:  So I have to look at the *Napoletano*

20   factors.  So my question to you is:  How do those factors

21   weigh in this case in a way that favors your view in view

22   that it appears that there's no administrative mechanism

23   for an administrative enforcement of this particular

24   statute?

25             MR. BLATCHLEY:  I don't -- again, with all due

1    respect, I don't know, even looking at the factors, that

2    it creates an implied right under the subject statute, the

3    section at issue, the subsection at issue.

4              THE COURT:  All right.

5              MR. BLATCHLEY:  To continue on, Your Honor, we

6    further believe that the defendant is exempt from the

7    21a-408p statute.  The language is "[u]nless required by

8    federal law or required to obtain federal funding: ...[n]o

9    employer may refuse to hire a person...solely on the basis

10   of such person's status as a qualifying patient..."

11             We had cited the Nursing Home Reform Act, the

12   requirement that nursing homes comply with all federal

13   state and local laws.

14             THE COURT:  Right.

15             MR. BLATCHLEY:  So because of that --

16             THE COURT:  So a nursing home has to comply with

17   the federal laws.

18             MR. BLATCHLEY:  Correct.

19             THE COURT:  Does it violate federal law for a

20   nursing home to hire somebody who smokes marijuana at

21   night after they go home?  Does it violate federal law to

22   do that?

23             MR. BLATCHLEY:  No, Your Honor.  In this case,

24   the Act -- what is happening here is the plaintiff is

25   using the general statute to essentially claim

 1   discrimination or an employment violation under the Act --

 2   excuse me, under the PUMA itself.

 3           THE COURT:  But the inquiry, as I understand it,

 4   for purposes of the FDA, is whether the nursing home is

 5   violating federal law, right, not whether one of its

 6   employees is violating federal law when off duty; is that

 7   right?

 8           MR. BLATCHLEY:  That's correct.  But if it's

 9   affirmatively being required to employ someone who is in

10   violation of the law, under this general statute, then

11   they wouldn't be in compliance with the law.

12           THE COURT:  Then your view is that hiring

13   somebody who is violating federal law is itself a

14   violation of federal law.

15           MR. BLATCHLEY:  Right.

16           THE COURT:  That's your argument?

17           MR. BLATCHLEY:  Yes.

18           THE COURT:  Any courts hold that, do you know?

19           MR. BLATCHLEY:  I don't know, Your Honor.

20           THE COURT:  Okay.

21           MR. BLATCHLEY:  The plaintiff's negligence

22   infliction of emotional distress fails as a matter of law.

23   Defendant's decision not to hire the plaintiff didn't

24   involve any unreasonable risk of causing emotional

25   distress to plaintiff or that resulted in bodily harm.

1    Defendant was within the law to refuse to hire plaintiff

2    as a result of her failed drug test which was a

3    precondition to the employment.  And mere termination of

4    employment, even when wrongful, is not by itself enough to

5    sustain a claim for negligent infliction of emotional

6    distress.  A mere act of firing an employee even if

7    wrongfully motivated doesn't transgress the bounds of

8    socially tolerable behavior.

9            If we look briefly at the chronology of the

10   application process, plaintiff was aware of the drug test

11   and the precondition and still chose to quit the job one

12   week before she told defendant about her medical marijuana

13   use.  So July 18, 2016, when the job offer was extended,

14   July 19th, the plaintiff accepted.  And on July 20th

15   plaintiff alleges, for purposes of the motion to dismiss

16   we take as true, the employee of Bride Brook scheduled a

17   meeting for July 25th including the preemployment drug

18   test at that time.  It was same day that plaintiff

19   resigned from Touchpoints, her current employer at the

20   time.  Significantly, though, plaintiff didn't allege that

21   she informed Bride Brook's employee or Bride Brook that

22   she was a medical marijuana user at the time.  And then

23   approximately a week later on July 25, plaintiff informed

24   Bride Brook of her medical marijuana use.  So we don't

25   believe -- as stated in the papers, plaintiff can't claim

 1    emotional distress when she quit her job prior to

 2    defendant's recision of the offer when the decision to

 3    quit was her own.  The defendant had no knowledge of

 4    plaintiff's medical marijuana use at the time and when

 5    defendant had informed plaintiff she would be drug tested

 6    as a precondition of employment before plaintiff quit her

 7    job.

 8            THE COURT:  Did defendant know that plaintiff

 9    has PTSD?

10            MR. BLATCHLEY:  I believe that was on July 25th,

11    Your Honor.  So it was --

12            THE COURT:  So in the complaint -- I guess first

13    thing's first, we're at a motion to dismiss, right?

14            MR. BLATCHLEY:  Yes.

15            THE COURT:  Don't I have to accept the

16    allegations of the complaint as true?

17            MR. BLATCHLEY:  Yes.

18            THE COURT:  Okay.  And so if paragraph 33 of the

19    complaint says the defendant was aware that plaintiff has

20    PTSD, have I to accept that, right?

21            MR. BLATCHLEY:  And we don't dispute that for

22    this motion.  But that was on July 25th, long after the

23    employment application.

24            THE COURT:  But it says that the defendant was

25    aware that she has PTSD, that she's a medical marijuana

1     user, and that she had left her job at Touchpoints

2     exclusively because of defendant's request and job offer.

3     I have to accept that as true, right?

4              MR. BLATCHLEY:  Right.  The knowledge -- it's

5     really spelled out at paragraphs 13 and 14, the

6     chronological history of when Bride Brook actually knew of

7     the alleged PTSD and the medical marijuana use.

8              THE COURT:  Okay.

9              MR. BLATCHLEY:  And lastly, the Act itself or

10    the section itself violates Bride Brook's equal protection

11    rights.  There's not a rational basis for the section at

12    issue and it requires Bride Brook to essentially employ

13    one Schedule I user to the elimination of any other

14    employee type.

15             THE COURT:  In raising an equal protection

16    claim, do I apply strict scrutiny or rational basis?

17             MR. BLATCHLEY:  Rational basis.

18             THE COURT:  When I look at rational basis, do I

19    have to look at what the actual reasons were that the

20    legislature had for the law or can I look at any

21    conceivable reason that the legislature might have it for

22    the law?

23             MR. BLATCHLEY:  I believe the actual reasons,

24    Your Honor.

25             THE COURT:  And here is there no rational basis

1    for the legislature to try to protect the employment

2    interest of people who have PTSD who are under the care of

3    a medical personnel in using marijuana?  That's not

4    rational?

5              MR. BLATCHLEY:  I think, Your Honor, there are

6    other forms of medical treatment.  In this case, as we

7    previously discussed, it runs afoul of federal law in the

8    efforts by Congress and the courts.  The Supreme Court in

9    multiple decisions has recognized that marijuana has no

10   medical purpose.  That's been held multiple times.

11             THE COURT:  Congress has done that.

12             So you're saying that the legislature could not

13   have acted rationally because it was passing a statute

14   that was contrary to federal law, the Control Substances

15   Act; is that ultimately your argument?

16             MR. BLATCHLEY:  Yes, Your Honor.

17             THE COURT:  All right.

18             MR. BLATCHLEY:  That's all I have.

19             THE COURT:  Thank you.

20             Mr. Murray.

21             MR. MURRAY:  Thank you, Your Honor.

22             Your Honor, I guess I would ask what you would

23   like me to address.  I'm happy to start with private right

24   of action and then address some of Mr. Blatchley's

25   comments in terms of preemption.

1          THE COURT:  That sounds great.

2          MR. MURRAY:  Okay.  I thought you might want me

3     to do that since in some respects it's my burden on the

4     private right of action.

5          The *Napoletano* case, which has never been

6     modified by either *Cannon v. University of Chicago* or the

7     *Gonzaga* case, but in some senses --

8          THE COURT:  Can I stop you there?

9          MR. MURRAY:  Sure.

10         THE COURT:  *Gonzaga* and *University of Chicago*

11    are federal law cases, right?

12         MR. MURRAY:  That's true.  They modified the

13    *Court v. Ash* case that *Napoletano* adopted.

14         THE COURT:  But my task here is one of state

15    law, isn't it?

16         MR. MURRAY:  I understand that.

17         THE COURT:  So I'm not bound by how the Supreme

18    Court might decide that an implied cause of action should

19    be derived from a federal statute, am I?

20         MR. MURRAY:  You are not, Your Honor, but --

21         THE COURT:  Just to be clear, isn't my task to

22    look or to try to predict how the Connecticut Supreme

23    Court would determine this issue?

24         MR. MURRAY:  Yes, it is, Your Honor.

25         THE COURT:  And shouldn't I do that in light of

1    what I think that the Connecticut Supreme Court would

2    understand to be the pertinent factors to whether a

3    private cause of action should be implied?

4              MR. MURRAY:  That's correct, Your Honor.

5              THE COURT:  Okay.

6              MR. MURRAY:  The only reason I mentioned *Gonzaga*

7    is because if you take a look at the cases since

8    *Napoletano* in which the Connecticut Supreme Court has not

9    found a private right of action, those are cases in which

10   the structure of the statute did not call for it, such as

11   in *Asylum Hill* or in other cases in which there are

12   alternative available remedies.  But also overlaying that

13   is the notion that if you look at those cases, what the

14   Court looks at is is there -- and the reason I brought in

15   *Gonzaga* is that gets to rights-producing language.  It is

16   clear that 21a-408p(3), in fact the entire structure, is a

17   rights-creating language.  So I'm suggesting to you that,

18   based on the *Napoletano* test, prong one, did it create a

19   class that was supposed to be benefited; number two, is

20   there any evidence for or against whether or not the

21   legislature intended to create a private right of action;

22   and number three, is creating a private right of action

23   one which would effectuate the purpose of the Act, I'm

24   submitting to the Court that in fact in all three

25   *Napoletano* prongs, I think that taking a look at the

1    structure of the PUMA statute at issue here, 21a-408p, it

2    is clear that a private right of action ought to be

3    authorized.

4             And I get to that point, Your Honor, also

5    because -- and I think we cited this in our brief -- if

6    you take a look at the 78 pages of regulations that the

7    Department of Consumer Protection issued regulating every

8    section of the Palliative Use of Marijuana Act, it's

9    extremely comprehensive.  There is only one section of the

10   Act that has absolutely no regulation and administrative

11   enforcement, and that is dealing with the employment

12   rights guaranteed to people who are qualifying patients.

13            THE COURT:  Okay.  So there's an omission there,

14   I understand that.  But I'll ask you the same question I

15   asked Attorney Blatchley, which is:  Does the DCP, as far

16   as you know, do they assert an authority to enforce the

17   provisions of 408p?  Have you asked them?

18            MR. MURRAY:  I have not asked the Department of

19   Consumer Protection.  I've had conversations in the

20   form --

21            THE COURT:  Do they have a web site?  Do they

22   say something at all in any kind of record about whether

23   they have authority to enforce 408p?

24            MR. MURRAY:  My understanding, Your Honor, is

25   that when they promulgated the regulations, they looked at

1    what the statute required them to do.  And the statute

2    required them to issue regulations on every one of the

3    parts of PUMA with the exception of 21-408p.  And that's

4    what they did.  They issued those regulations.  I'm not

5    aware of any other authority.

6              And I would come back -- I mean, one of the --

7    the *Skakel* decision is one which holds that when an

8    affirmative right has been created and there are no

9    administrative remedies available and there's nothing in

10   the underlying legislative record which would indicate

11   that there is, you know, not a denial of a private right

12   of action, that private right of action ought to be found.

13   That was certainly one of the holdings of our Supreme

14   Court.  That's why I'm suggesting to you and suggested to

15   the Court that I believe taking a look at the structure of

16   the statute, which is what the Connecticut Supreme Court

17   does when they're looking at *Napoletano* cases, and looking

18   at the absence of administrative remedy and the absence of

19   any negative legislative history indicating that there

20   shouldn't be a private right of action, it's my belief

21   that the Connecticut Supreme Court would find a private

22   right of action in this case.

23             THE COURT:  And the use of mandatory sounding

24   language, rights-creating type --

25             MR. MURRAY:  Yes, it's rights-producing

1    language.  In fact, without creating a private right of

2    action, you would then be having a statutory provision

3    which was mere words which have no way to enforce

4    21a-408p.  So I believe that -- and looking at all of the

5    cases, I mean, I know that when Judge Kravitz certified to

6    the Connecticut Supreme Court the *Rollins v. People's*, it

7    was Justice Palmer that issued the decision, he did say

8    that we have not since *Napoletano* reached many private

9    causes of action.  But I believe this case which creates

10   rights very similar to what the Supreme Court -- I

11   understand that you're looking at Connecticut law, but one

12   of the things the Supreme Court in the *Cannon/University*

13   *of Chicago* case did was look at the fact that it was

14   rights-creating language that gave rights and that only a

15   private right of action was something that could vindicate

16   this.

17            THE COURT:  The parties have not addressed this

18   in their briefing.  I have not received a request to

19   certify this to the Connecticut Supreme Court.

20            MR. MURRAY:  Well, we believe that -- I mean,

21   this is -- I believe that you have the authority,

22   Your Honor, taking a look at the Connecticut case law, to

23   determine whether or not a private right of action exists.

24            THE COURT:  Okay.

25            Anybody else filed suit?  Are you the first?

1          MR. MURRAY:  It's my understanding, Your Honor,

2    that there may be a state court decision, but I don't know

3    where that's at.  It's certainly not -- this is the first

4    one that I'm aware of.

5          THE COURT:  Our research indicated no other

6    reported decisions or no published decisions.  There may

7    have been another lawsuit, but it's gone away.

8          MR. MURRAY:  There are no reported decisions

9    that I know of.

10          Your Honor addressed a hypothetical when

11   Mr. Blatchley was up here in terms of the enforcement of

12   federal law.  It seems to me that in fact that's the

13   *Ter Beek* case in which the ordinance in the town was

14   geared to saying that you can't operate -- engage in any

15   activity, whether it's zoning operation or your own

16   personal activity, if it's in violation of federal law.

17   The Supreme Court of Michigan basically didn't buy that

18   argument.  It said that's not an obstacle, that's not a

19   preemption obstacle under the Controlled Substances Act.

20   So I think that if you're looking for at least a case law

21   trail --

22          THE COURT:  Although that cuts a little

23   differently, right, because the statute said you can't do

24   something if it's in violation.

25          MR. MURRAY:  That's true.  But it seemed to me

1    that *Ter Beek* is on to essentially what is the -- what's

2    the operative important analysis when dealing with

3    preemption.

4              THE COURT:  What about the *Tractor Supply* case

5    in New Mexico?

6              MR. MURRAY:  I'm sorry, I didn't hear you.

7              THE COURT:  Are you familiar with the *Tractor*

8    *Supply* case?

9              MR. MURRAY:  I wanted to get to that,

10   Your Honor, because one of the things -- and I think if

11   you look carefully at the defendant's brief, it uses the

12   word "authorize" quite a bit and it uses "accommodate."  I

13   submit that the reason it uses that language is because

14   the defendant has hooked its argument to the cases like

15   *Emerald Steel*, the *Garcia* case, *Coates*, and there's

16   another one, I'm forgetting it right now, one out of the

17   state of Washington.  In each of those cases it turned on

18   whether or not authorization -- for example, authorized

19   under state law.  But most importantly, the reason we get

20   to the word "accommodation" is in each one of those case,

21   those individuals in the absence of any law like the one

22   here in Connecticut which protected a qualified patient's

23   right to be free of employment discrimination, none of

24   those existed in New Mexico with *Garcia*, in Oregon with

25   *Emerald*, with *Coates* in Colorado, and the other case that

```
 1   I'm taking a blank on from Washington state, it was a
 2   telecommunications case.  In each of those cases the
 3   plaintiff essentially argued -- tried to bootstrap the
 4   argument of employment -- essentially ADA and disability
 5   discrimination, that the employer needed to accommodate
 6   their use of marijuana because it happened to be something
 7   that -- because they had a disability.  In each of those
 8   cases it was because it was not, as in Connecticut, a
 9   clear employment right to be free of discrimination if
10   one's a qualified patient.
11           THE COURT:  And Judge Johnson makes that point,
12   doesn't he?
13           MR. MURRAY:  I'm sorry?
14           THE COURT:  Judge Johnson in the *Tractor Supply*
15   case, he says expressly at the outset of his opinion
16   New Mexico is unlike Connecticut --
17           MR. MURRAY:  Unlike Connecticut and Delaware,
18   that's right.
19           And I think, Your Honor, one of the reasons that
20   I bring it to your attention, I think the reason the
21   defendant uses the word "accommodate," that's a word of
22   art.  That's a term of art under the Americans with
23   Disabilities Act.  And so I think the plaintiffs in those
24   particular cases were arguing accommodation because they
25   had no other avenue.  And I think the *Ter Beek*, the
```

1    Michigan Supreme Court didn't think much of the *Emerald*
2    *Steel* justification for reaching preemption in that
3    particular case.  But I think that that --

4              THE COURT:  So tell me in your own words why it
5    is that there's no positive conflict here between the
6    Connecticut statute and the Controlled Substances Act?

7              MR. MURRAY:  Well, the Connecticut statute
8    doesn't require, for example, the defendant to cultivate,
9    possess, or distribute marijuana in violation of the
10   Controlled Substances Act.  The Controlled Substances Act
11   has -- and I think we said this in our brief, the only
12   mention of the employment relationship anywhere in the
13   Controlled Substances Act is a prohibition on drug dealers
14   having in their employ individuals under the age of 18.
15   That's the only mention.  So there's absolutely no
16   positive.  Because what 903 talks about is not only a
17   positive conflict on the same subject matter.  And there
18   is essentially no mention in the Controlled Substances Act
19   of anything to do with the subject of employment
20   discrimination or employment protections.

21             I further just point out to Your Honor that I
22   think the defendant ignored in its reply brief what I
23   think is an important issue, at least in terms of whether
24   Congress thinks that the Controlled Substances Act
25   preempts state marijuana laws.  In December 2014 Congress

```
 1   passed a budget appropriation in which it specifically set

 2   forth each of the states and the territories in the

 3   District of Columbia that have medical marijuana laws, and

 4   it stated not a dime of Department of Justice

 5   appropriations could be spent on the enforcement of --

 6               THE COURT:  I saw that.  I really wasn't

 7   persuaded much by that argument because it just goes to an

 8   appropriations limitations; it doesn't go to the issue of

 9   preemption, which is a legal issue.

10               MR. MURRAY:  I understand that.

11               THE COURT:  So if Congress thought that it

12   didn't preempt it, then it would have passed something in

13   the Controlled Substances Act itself rather than something

14   slipped into a temporary time-expiring appropriations --

15               MR. MURRAY:  And I understand it's a different

16   analysis.

17               THE COURT:  And my job as well, when I'm looking

18   at the Controlled Substances Act, is to look at Congress's

19   intent at the time of passage, not at some later time,

20   some later Congress, right?

21               So I'd like to move beyond the Controlled

22   Substances Act, on the ADA.

23               MR. MURRAY:  Yes.

24               THE COURT:  And do you have, by chance, a copy

25   of it with you?
```

1          MR. MURRAY:  I'm sorry, I don't, Your Honor.

2          THE COURT:  Are you familiar with the provisions

3    that are quoted in the briefing of the ADA, at least the

4    provision of 12114?

5          MR. MURRAY:  Is that in the defendant's brief,

6    Your Honor?

7          THE COURT:  There's reliance on, in defendant's

8    briefing, on 12114(c)(4).

9          MR. MURRAY:  What page would that be?

10         THE COURT:  It's quoted at page 18 of

11   defendant's initial opening brief.

12         MR. MURRAY:  Yes, I see it.

13         THE COURT:  So I looked at the full statute

14   there and it raises some questions in my mind about the

15   preemption issue that to me seemed the closest in the

16   case.  That provision provides that a covered entity, and

17   I quote, "may hold an employee who engages in the illegal

18   use of drugs or who is an alcoholic to the same

19   qualification standards for employment or job performance

20   and behavior that such entity holds other employees."

21         And when I look at just that language, plain

22   language there, that does seem possibly more than simply

23   intention, but it does seem to be in conflict with a state

24   law that says essentially here that the employer cannot

25   hold your client to the same qualification standard as it

1   holds other employees.

2           MR. MURRAY:  Well, actually, Your Honor, I think

3   I would differ with that.  I think the statute we're

4   talking about, 21a-408p actually contains a proviso which

5   mirrors what the ADA requires in saying that you can hold

6   someone to the same standard.  You don't have to tolerate

7   intoxication on the job which either endangers employees,

8   endangers others, it covers employee performance.  The

9   only qualification that the defendants seem to be pointing

10  to is the drug test.

11          THE COURT:  I think the problem with that

12  argument, and I'm aware of the additional language in

13  408-p(3), is that the predecessor language in the ADA,

14  that same portion of sub-part (c) that I just quoted -- I

15  know you don't have it with you -- but that also says that

16  a covered entity may prohibit the illegal use of drugs at

17  the workplace, may require the employees shall not be

18  under the influence of illegal drugs at the workplace, it

19  says all that.  But then it goes on to say that critical

20  language here that the employer "may hold an employee who

21  engages in the illegal use of drugs" -- and it doesn't say

22  at the workplace; it just says who engages in the illegal

23  use of drugs -- and then it says "or who is an alcoholic

24  to the same qualification standards as other employees."

25          And I read that language to really suggest that

1    the qualification standard, whether it's framed in terms

2    of failing a drug test or your client I think admitting to

3    the employer that she uses marijuana or cannabis-based

4    substance.  That's what I'm curious about.  It doesn't

5    seem to have gotten a lot of attention in the parties'

6    briefing, it seems to me to be where the closest issue on

7    preemption is in this case.

8            MR. MURRAY:  It seems to me if one takes a look

9    at the structure of the ADA as it's laid out, one of the

10   things that the ADA said is if you are someone who is

11   using illegal drugs, it doesn't matter if you use them in

12   the workplace or not, or you're an alcohol, again whether

13   or not you're impaired in the workplace, and you're

14   currently in that status, all right, then you are not a

15   qualified individual with a disability.  If you're not a

16   qualified individual with a disability, then the employer

17   is relieved of its obligation to provide you with a

18   reasonable accommodation for which you could then perform

19   the full functions of your job.

20           I would argue that I believe that this part of

21   the ADA is dealing with is someone a qualified individual

22   with a disability.  And if they have to hold them to the

23   same standards, it may mean that because you're not a

24   qualified individual with a disability, the employer does

25   not have to provide an accommodation for that person to

```
 1    perform the essential functions of their job with an
 2    accommodation.  I would argue that I believe that's what
 3    that section of the ADA is getting at.
 4            THE COURT:  Does your briefing address this
 5    issue?
 6            MR. MURRAY:  No, I'm sorry, I don't think it
 7    does, Your Honor.
 8            THE COURT:  Because I found it odd.  It was
 9    pretty prominent in defense briefing and then on your ADA
10    section you didn't address this one provision here.  And I
11    guess you're making kind of a structural argument to me
12    here now, but the text looks like it's pretty clear that
13    they can hold them to this -- that an employer can hold
14    somebody to the same qualification standards for
15    employment.  That's like at the hiring decision.  I'm not
16    sure if there's case law or something else that talks
17    about --
18            MR. MURRAY:  That may be a conflict, Your Honor,
19    in some respects with the fact that an applicant can ask
20    for an accommodation as well as an existing employee.  I
21    guess I'm suggesting to you that I believe that that
22    section of the ADA is dealing with the fact that if
23    someone is using illegal drugs and is an alcoholic, it
24    makes a distinction if one is in a recovery program or one
25    is in a treatment program for either alcohol, then you are
```

1  a qualified individual with a disability for whom the Act

2  provides protection and to whom the Act will allow the

3  employer to provide you with a reasonable accommodation.

4          THE COURT:  Okay.  The language here, though, is

5  not talking about qualified individuals.  It's talking

6  about qualification standards.

7          It's probably going to be helpful for me to get

8  some supplemental briefing on this from the parties about

9  this particular provision and about the savings clause

10  that I was asking Mr. Blatchley about.

11          MR. MURRAY:  Is there any other thing you wish

12  to have me address?

13          THE COURT:  I don't think so.

14          MR. MURRAY:  And Your Honor, I do have just sort

15  of a procedural question.  This Friday at 4:00 p.m. you

16  had scheduled a status conference call.

17          THE COURT:  I don't think we need to have that,

18  sure.

19          MR. MURRAY:  And I guess I'll go sit down.  You

20  can tell us when you would like to have that supplemental

21  briefing.  Thank you.

22          THE COURT:  Mr. Blatchley, do you have anything

23  you want to raise in response to what you heard?

24          MR. BLATCHLEY:  No, thank you, Your Honor.

25          THE COURT:  What I'd like to do, it would be

1    helpful for me for the parties to specifically address

2    further briefing on the effect of ADA Section 42 U.S.C.

3    12114(c)(4) in light of the questions I've asked at

4    argument today as well as to address the effect of ADA

5    Section 42 U.S.C. Section 12201(b) which I referred to as

6    the savings clause, but that you heard me -- that's also

7    not addressed, I don't think, in the parties' briefing.  I

8    don't know what your other time demands are.  I've got

9    plenty of other cases to keep me busy.  Would you be able

10   to do some briefing on that in about three weeks or a

11   month?  What would you like?

12               MR. MURRAY:  A month would probably be good,

13   Your Honor.  It's a very busy month.

14               THE COURT:  Why don't we do 30 days, then, if

15   you could both submit briefing on that.  And then any

16   replies that you want to make to each other's briefing if

17   you could do within ten days of that.

18               MR. BLATCHLEY:  Yes, Your Honor.

19               THE COURT:  And that would be helpful for me.  I

20   really feel I need more guidance on those two provisions

21   before I can rule in the case.

22               And I don't see any clients here.  Are the

23   clients aware of today's argument?

24               MR. MURRAY:  Yes, Your Honor.  Katelin

25   Noffsinger, this is one of the days in which she works.

1   And so she couldn't take the day off, unfortunately,

2   because she only has a limited number of days that she's

3   employed.

4           THE COURT:  Is she still doing recreational

5   therapy?

6           MR. MURRAY:  No.

7           THE COURT:  If I could ask you to stand.

8           MR. MURRAY:  I'm sorry, Your Honor.

9           Actually, what she's doing is not doing the

10  recreational therapy now.  I believe she's working as a

11  nanny, which is one of the reasons why she can't take time

12  off because she's taking care of small children.  I spoke

13  with her on Friday and she told me that she couldn't be

14  here because of that.

15          THE COURT:  All right.

16          And your clients, Mr. Blatchley, are they aware

17  of today's argument?

18          MR. BLATCHLEY:  Yes, they are, Your Honor.

19          THE COURT:  Just didn't want to be here or are

20  they busy?

21          MR. BLATCHLEY:  No.  Conflicts, Your Honor.  The

22  corporate office is in Georgia.

23          THE COURT:  That's quite a ways, all right.

24          MR. BLATCHLEY:  I told them that I'd handle the

25  argument and report back.

1          THE COURT:  Sounds good.

2          Anything else to take up?

3          Thank you.  We'll stand in recess.

4              (Proceedings adjourned at 5:02 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4      RE: KATELIN NOFFSINGER v. SSN OPERATING COMPANY LLC

5                      No. 3:16CV1938(JAM)

6

7

8             I, Diana Huntington, RDR, CRR, Official Court

9      Reporter for the United States District Court for the

10     District of Connecticut, do hereby certify that the

11     foregoing pages 1 through 41 are a true and accurate

12     transcription of my shorthand notes taken in the

13     aforementioned matter to the best of my skill and ability.

14

15

16

17

18                     _____/s/_____

19                     DIANA HUNTINGTON, RDR, CRR
                         Official Court Reporter
20                     United States District Court
                         141 Church Street, Room 147
21                     New Haven, Connecticut 06510
                           (860) 463-3180
22

23

24

25