# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

KATELIN NOFFSINGER,
    *Plaintiff*,

    v.

SSC NIANTIC OPERATING COMPANY
LLC, d/b/a BRIDE BROOK NURSING &
REHABILITATION CENTER,
    *Defendant*.

No. 3:16-cv-01938 (JAM)

## RULING ON DEFENDANT'S MOTION TO DISMISS

Connecticut is one of a growing number of States to allow the use of marijuana for medicinal purposes. Connecticut likewise bars employers from firing or refusing to hire an employee who uses medical marijuana in compliance with the requirements of Connecticut law. By contrast, federal law categorically prohibits the use of marijuana even for medical purposes.

This lawsuit calls upon me to decide if federal law preempts Connecticut law. In particular, I must decide if federal law precludes enforcement of a Connecticut law that prohibits employers from firing or refusing to hire someone who uses marijuana for medicinal purposes. I conclude that the answer to that question is "no" and that a plaintiff who uses marijuana for medicinal purposes in compliance with Connecticut law may maintain a cause of action against an employer who refuses to employ her for this reason. Accordingly, I will largely deny defendant's motion to dismiss this lawsuit.

### BACKGROUND

For the last two decades, state legislatures across the United States have been passing laws to permit and regulate the use of marijuana for medicinal purposes. *See* NATIONAL CONFERENCE OF STATE LEGISLATURES, STATE MEDICAL MARIJUANA LAWS (July 7, 2017).

1

Connecticut is one of 29 States that have "comprehensive public medical marijuana and cannabis programs," and an additional 16 States have more limited programs allowing for the use of "low THC, high cannabidiol" products for particular medical reasons. *Ibid.*

The range of state statutes provide different rights and remedies to medical marijuana users. While all protect qualified users from state criminal prosecution, many also include broader protections "stating that medical marijuana patients are not to be subject to 'penalty,' 'sanction,' or may not be 'denied any right or privilege.'" Elizabeth Rodd, *Light, Smoke, and Fire: How State Law Can Provide Medical Marijuana Users Protection from Workplace Discrimination*, 55 B.C. L. Rev. 1759, 1768 (2014). Several States—including Connecticut— provide explicit protection against employment discrimination on the basis of the medicinal use of marijuana in compliance with state law. *Ibid.*[1]

Notwithstanding the proliferation of state marijuana-use statutes, federal law stands to the contrary. The federal Controlled Substances Act classifies marijuana as a Schedule I substance, meaning that Congress has decided that "marijuana has no medicinal value." Kathleen Harvey, *Protecting Medical Marijuana Users in the Workplace*, 66 Case W. Res. L. Rev. 209, 211 (2015). Given the proliferation of state medical marijuana laws, courts around the country are now confronted with the question of how these permissive state laws may reconcile—if at all— with federal law.

In 2012, Connecticut enacted the Palliative Use of Marijuana Act (PUMA), Conn. Gen. Stat. § 21a-408 *et seq.* PUMA permits the use of medical marijuana for "qualifying patients" with certain debilitating medical conditions. The law exempts such patients, their primary

---

[1] Eight other States besides Connecticut have passed medical marijuana laws that include explicit anti-discrimination protections from adverse employment actions. *See* Ariz. Rev. Stat. § 36-2813; Del. Code Ann. tit. 16, § 4905A; 410 Ill. Comp. Stat. 130/40; Me. Rev. Stat. tit. 22, § 2423-E; Nev. Rev. Stat. § 453A.800; N.Y. Pub. Health Law § 3369; Minn. Stat. § 152.32; R.I. Gen. Laws § 21-28.6-4.

caregivers, and prescribing doctors from state criminal penalties that would otherwise apply to those who use or distribute marijuana. It also sets forth a framework for a system of licensed dispensaries and directs the Department of Consumer Protection to adopt implementing regulations. Most importantly for purposes of this case—and in contrast to medical marijuana laws in many other States—PUMA includes a provision that explicitly prohibits discrimination against qualifying patients and primary caregivers by schools, landlords, and employers. *See* Conn. Gen. Stat. § 21a-408p(b).[2]

Plaintiff's complaint alleges the following facts, which I accept as true for the purposes of this motion to dismiss. In 2012, plaintiff Katelin Noffsinger was diagnosed with post-traumatic stress disorder (PTSD). In 2015, her doctors recommended medical marijuana to treat her PTSD. She registered with the state Department of Consumer Protection as a qualifying patient under PUMA. After receiving her registration certificate, plaintiff began taking one capsule of Marinol, a synthetic form of cannabis, each night as prescribed.

When she started taking Marinol, plaintiff was employed as a recreation therapist at Touchpoints, a long-term care and rehabilitation provider. In July 2016, plaintiff was recruited for a position as a director of recreational therapy at Bride Brook, a nursing facility in Niantic, Connecticut. After a phone interview, plaintiff interviewed in person on July 18 with Lisa Mailloux, the administrator of Bride Brook. During the interview, Mailloux offered plaintiff the position, and plaintiff accepted the offer the following day. On July 20, Mailloux contacted

---

[2] Conn. Gen. Stat. § 21a-408p(b)(3) provides as follows: "[U]nless required by federal law or required to obtain funding: . . . (3) No employer may refuse to hire a person or may discharge, penalize or threaten an employee solely on the basis of such person's or employee's status as a qualifying patient or primary caregiver under sections 21a-408 to 21a-408n, inclusive. Nothing in this subdivision shall restrict an employer's ability to prohibit the use of intoxicating substances during work hours or restrict an employer's ability to discipline an employee for being under the influence of intoxicating substances during work hours." The Act elsewhere explicitly indicates that PUMA does not permit the ingestion of marijuana in the workplace. *See* Conn. Gen. Stat. § 21a-408a(b)(2).

plaintiff to set up a meeting for July 25 to complete paperwork and a routine pre-employment drug screen. Mailloux also instructed plaintiff to give notice to Touchpoints so that plaintiff could begin working at Bride Brook on August 3. Plaintiff informed Touchpoints that her last day would be August 2.

On July 25, plaintiff met with Mailloux as scheduled. At this meeting, plaintiff disclosed her disability of PTSD and explained that she was taking prescription marijuana as a "qualifying patient" under PUMA. Plaintiff showed Mailloux her registration certificate and explained that she took Marinol, but only in the evening before bed, and therefore she was never impaired during the workday. Plaintiff also offered to provide additional medical documentation, but Mailloux did not request it. Mailloux continued to process plaintiff's pre-employment documents and gave plaintiff a packet of documents to complete at home and bring back when she returned for orientation on August 3. At the same meeting, plaintiff provided defendant with a urine sample to be used as part of the pre-employment drug test.

On August 2, the day before plaintiff was scheduled to start work at Bride Brook, the drug testing company used by Bride Brook called plaintiff to inform her that she had tested positive for cannabis. Plaintiff immediately called Mailloux and left a voice message in which she informed Mailloux of her call with the drug testing company and asked a question about the upcoming orientation session. Later that day, Mailloux called plaintiff back to inform her that Bride Brook was rescinding plaintiff's job offer because she had tested positive for cannabis. In the meantime, plaintiff's former position at Touchpoints had already been filled, so she was not able to remain employed there.

On August 22, 2016, plaintiff filed a complaint in Connecticut Superior Court, alleging three causes of action: (1) a violation of PUMA's anti-discrimination provision, Conn. Gen. Stat.

§ 21a-408p(b)(3), (2) a common law claim for wrongful rescission of a job offer in violation of public policy, and (3) negligent infliction of emotional distress. Plaintiff brings these claims against a single defendant, SSC Niantic Operating Company, LLC d/b/a Bride Brook Nursing & Rehabilitation Center. Defendant removed the case to federal court on the basis of diversity jurisdiction, and has now moved to dismiss on several grounds discussed below.

DISCUSSION

The background principles governing a Rule 12(b)(6) motion to dismiss are well established. The Court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless its factual recitations state a claim to relief that is plausible on its face. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014). Moreover, "'[a]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action . . . do not suffice'" to survive a motion to dismiss. *Ibid.* (quoting *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)). In short, my role in reviewing the motion to dismiss is to determine whether the complaint—apart from any of its conclusory allegations—sets forth sufficient facts to state a plausible claim for relief.

### Preemption

Defendant's principal argument for dismissal is that PUMA is preempted by three different federal statutes: the Controlled Substances Act, the Americans with Disabilities Act, and the Food, Drug, and Cosmetic Act. Although defendant raises other challenges as well to each of plaintiff's claims, I will first address defendant's preemption arguments insofar as PUMA's validity under federal law impacts all of plaintiff's claims.

The U.S. Constitution's Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. It follows that Congress may preempt a state law by means of a federal statute. Congress may accomplish this in several ways. It may do so expressly ("express preemption"), or it may preempt state law implicitly in circumstances where it is clear that Congress intended to occupy an entire regulatory field ("field preemption"). Congress may also preempt state law where state law stands as an obstacle to the objectives of Congress ("obstacle preemption") or where simultaneous compliance with both federal and state law is impossible ("impossibility preemption"). *See Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015); *Madden v. Midland Funding, LLC*, 786 F.3d 246, 249–50 (2d Cir. 2015). In general, a federal statute will not be found to preempt claims arising under state law unless Congress's intent to do so is "clear and manifest." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

Defendant argues that the Controlled Substances Act, Americans with Disabilities Act, and Food, Drug, and Cosmetic Act each invalidate PUMA under a theory of obstacle preemption. Under obstacle preemption, a state law is preempted where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012).

A defendant making an argument under obstacle preemption faces a heavy burden. "The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006). Rather, obstacle preemption precludes only those state laws that create an "actual conflict" with an overriding federal purpose and objective. *See Mary Jo C. v. N.Y. State & Local*

6

*Ret. Sys.*, 707 F.3d 144, 162 (2d Cir. 2013). What constitutes a "sufficient obstacle" is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Ibid.* (internal quotation marks omitted). But "the conflict between state law and federal policy must be a sharp one." *Marsh v. Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007) (internal quotation marks omitted). Indeed, there is no preemption unless "the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *In re MTBE Prods. Liab. Litig.*, 725 F.3d 65, 102 (2d Cir. 2013).

### *1. Controlled Substances Act*

Defendant first argues that PUMA is preempted by the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* ("CSA"). Specifically, defendant contends that by "affirmatively authoriz[ing] the medical use, possession, cultivation, sale, dispensing, and distribution of marijuana," PUMA "stands as an impermissible obstacle to the basic purpose of the CSA." Doc. #18-1 at 12. In response, plaintiff argues that because the CSA does not regulate the employment relationship, the employment anti-discrimination provision of PUMA does not conflict with or stand as an obstacle to the CSA. Doc. #27 at 11. I agree with plaintiff.

The CSA makes it a federal crime to use, possess, or distribute marijuana. "The main objectives of the CSA were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances." *Gonzales v. Raich*, 545 U.S. 1, 12 (2005). To carry out these goals, "Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA." *Id.* at 13. The CSA classifies marijuana as a Schedule I substance, which indicates the drug's "high potential for abuse," and the CSA allows no exceptions for medical use. 21 U.S.C. § 812; *see also United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001).

The CSA, however, does not make it illegal to employ a marijuana user. Nor does it purport to regulate employment practices in any manner. It also contains a provision that explicitly indicates that Congress did not intend for the CSA to preempt state law "unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together." 21 U.S.C. § 903.

Defendant argues that PUMA stands as an obstacle to the CSA because it affirmatively authorizes the very conduct—marijuana use—that the CSA prohibits. But this argument is overbroad and overlooks the operative provision of PUMA that is at issue in this case: the specific provision of PUMA (Conn. Gen. Stat. § 21a-408p(b)(3)) that prohibits an employer from discriminating against authorized persons who use medicinal marijuana. Plaintiff contends that defendants have violated this particular provision, and plaintiff does not otherwise seek enforcement of PUMA *en toto* or of other provisions of PUMA. Accordingly, I must focus on PUMA's specific anti-employment discrimination provision rather than the statute as a whole, because in preemption cases, "state law is displaced only to the extent that it actually conflicts with federal law," and "a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it." *Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 476 (1996) (*per curiam*).

No court has considered whether the CSA preempts § 21a-408p(b)(3) or any other provisions of PUMA. So far as I can tell, there have been no cases interpreting PUMA at all. Although state and federal courts around the country have evaluated other States' medical marijuana statutes—including in the employment context—many of those cases are of limited value here, because the statutory provisions at issue in those cases are not analogous to the anti-discrimination provision of § 21a-408p(b)(3).

8

For example, defendant relies heavily on *Emerald Steel Fabricators, Inc. v. Bureau of Labor & Indus.*, 230 P.3d 518 (Or. 2010), in which the Oregon Supreme Court determined that Oregon's medical marijuana statute was preempted by the CSA. Factually, the context in *Emerald Steel* is quite similar to this case: a plaintiff was fired by his employer one week after disclosing his status as a state-law-authorized user of medical marijuana. Legally, however, *Emerald Steel* is different, because Oregon's medical marijuana statute contains no provision explicitly barring employment discrimination.[3] The very different question presented in *Emerald Steel* was whether the CSA more generally preempted a provision of Oregon law that authorized the use of medical marijuana. Here, by contrast, the question is whether the CSA preempts a provision that prohibits an employer from taking adverse action against an employee on the basis of the employee's otherwise state-authorized medicinal use of marijuana.

So *Emerald Steel* is distinguishable, because it did not concern a statutory anti-discrimination-against-use-of-medical-marijuana provision. Other factually similar cases are even more distinguishable, because they have been decided on statutory interpretation grounds rather than on preemption grounds. *See, e.g.*, *Coats v. Dish Network, LLC*, 350 P.3d 849 (Colo. 2015) (plaintiff was not protected under statute that prohibited employer from terminating employee due to employee's participating in "lawful" activities off the premises of the employer during non-working hours, because court interpreted "lawful" to mean lawful under both state and federal law); *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 435–36 (6th Cir. 2012)

---

[3] The plaintiff in *Emerald Steel* brought his claim under ORS 659A.112, a state law that protects employees against discrimination on the basis of disability. The defendant argued that it had no obligation to accommodate the plaintiff's medical marijuana use, because the law provided an exemption to the protection of ORS 659A.112, for cases in which the employer takes action based on an employee's illegal use of drugs. The decision in *Emerald Steel* turned on whether the plaintiff's use of medical marijuana constituted "the use of illegal drugs," and therefore it turned on whether the use of medical marijuana was "lawful." The Oregon Supreme Court held that it was not lawful, because the provision of Oregon's medical marijuana act that authorized the use of medical marijuana was preempted by the CSA.

(Michigan's medical marijuana statute, which provides protection against disciplinary action by a "business," does not impose restrictions on private employers, as a matter of textual interpretation); *Stanley v. Cty. of Bernalillo Comm'rs*, 2015 WL 4997159, at *5 (D.N.M. 2015) (citing additional cases in which courts have "rejected the plaintiff's claims that state anti-discrimination laws prohibit private employers from terminating employees for state-authorized medical marijuana usage as a matter of statutory interpretation, and not on federal-preemption grounds").

Although most cases dealing with the CSA's preemption of state medical marijuana statutes have come out in favor of employers, these cases have not concerned statutes with specific anti-discrimination provisions; courts and commentators alike have suggested that a statute that clearly and explicitly provided employment protections for medical marijuana users could lead to a different result.[4] Indeed, one court recently held that the CSA does not preempt the anti-discrimination-in-employment provision of Rhode Island's medical marijuana statute. *See Callaghan v. Darlington Fabrics Corp.*, 2017 WL 2321181, at *13–14 (R.I. Super. 2017).

Like the provision at issue in *Callaghan*, § 21a-408p(b)(3) of PUMA regulates the employment relationship, an area in which States "'possess broad authority under their policy powers to regulate.'" *Arizona*, 567 U.S. at 404 (quoting *De Canas v. Bica*, 424 U.S. 351, 356 (1976)). Given that the CSA nowhere prohibits employers from hiring applicants who may be engaged in illegal drug use, defendant has not established the sort of "positive conflict" between § 21a-408p(b)(3) and the CSA that is required for preemption under the very terms of the CSA.

---

[4] *See, e.g.*, *Roe v. Teletech Customer Care Mgmt. LLC*, 171 Wash. 2d 736, 748 (2011); *Ross v. RagingWire Telecomms., Inc.*, 42 Cal. 4th 920, 927–28 (2008); Kathleen Harvey, *Protecting Medical Marijuana Users in the Workplace*, 66 CASE W. RES. L. REV. 209, 222 (2015) (arguing that the CSA does not preempt provisions that provide explicit employment protections to medical marijuana patients); Taylor Oyaas, Note, *Reefer Madness: How Tennessee Can Provide Cannabis Oil Patients Protection from Workplace Discrimination*, 47 U. MEM. L. REV. 935, 967 (2017) (arguing that Tennessee can and should avoid the problems faced by the plaintiff *Emerald Steel* by adopting explicit employment protections for medical marijuana users).

*See* 21 U.S.C. § 903. Nor does any tension between § 21a-408p(b)(3) and the CSA rise to the level of the "sharp" conflict required to establish obstacle preemption under the case law. The CSA does not preempt § 21a-408p(b)(3).

### 2.  *Americans with Disabilities Act*

Defendant next contends that PUMA's anti-discrimination employment provision is preempted by the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). The ADA of course protects the rights of persons with disabilities to be free from discrimination, including discrimination in the employment context. Given the ADA's remedial purpose to protect employees from discrimination, it may seem odd to suppose that the ADA of all statutes should be understood to preclude the States from fighting employment discrimination of any kind.

Defendant nevertheless fashions its somewhat counterintuitive ADA preemption argument from a provision of the ADA—42 U.S.C. § 12114—that was crafted in order to make clear that the ADA does not extend its protections to persons who use illicit drugs or alcohol. This provision of the ADA contains numerous sub-provisions, several of which are important to consider here:

- Section 12114(a) states that "[f]or purposes of this subchapter, a qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity [employer] acts on the basis of such use."

- Section 12114(b) provides in part that "it shall not be a violation" of the ADA for an employer to engage in "drug testing" in order to ensure that a person who has previously participated in a drug rehabilitation program "is no longer engaging in the illegal use of drugs."

- Section 12114(c)(1) provides that an employer "may prohibit the illegal use of drugs and the use of alcohol at the workplace by all employees."

- Section 12114(c)(4) provides that an employer "may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee."

- Section 12114(d)(2) provides that "[n]othing in this subchapter shall be construed to encourage, prohibit, or authorize the conducting of drug testing for the illegal use of drugs by job applicants or employees or making employment decisions based on such test results."

In essence, § 12114(a) creates an illicit-drug-use exception to the protections of the ADA, and then the rest of § 12114 outlines what steps that employers may take with respect to illicit drug use without violating the ADA.

I draw the following conclusions from these various sub-provisions of § 12114. First and most importantly, the ADA explicitly provides that an employer "may prohibit the illegal use of drugs and the use of alcohol *at the workplace* by all employees." 42 U.S.C. § 12114(c)(1) (emphasis added). But the facts of this case do not involve any use of marijuana by plaintiff at the workplace, and PUMA explicitly declines to authorize such workplace use. *See* Conn. Gen. Stat. §§ 21a-408p(b)(3), 21a-408a(b)(2). And the fact that the ADA does not further provide that an employer may prohibit an employee from the illegal use of drugs *outside* of the workplace is a powerful indication that the ADA was not meant to regulate non-workplace activity, much less to preclude the States from doing so or to preclude the States from prohibiting employers from

taking adverse actions against employees who may use illegal drugs outside the workplace (and whose drug use does not affect job performance).

Second, although the ADA refers to and contemplates employers' use of drug testing, it does so for a limited purpose to make clear that such use of drug testing is not itself a violation of the ADA. *See* 42 U.S.C. § 12114(b). Other than making clear what conduct does not violate the ADA, the ADA is not an employer's *Magna Carta* to engage in drug testing of all employees. That is why § 12114(d)(2) provides that the ADA does not "encourage, prohibit, *or authorize*" drug testing of applicants or employees. The fact that the ADA allows an employer to use drug testing without fear of facing liability under the ADA does not additionally and exorbitantly mean that the ADA was intended to categorically preclude the States from preventing an employer from taking adverse action against someone who fails any kind of a drug test.

Defendant relies heavily on the wording of § 12114(c)(4), which as noted above provides that an employer "may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same *qualification standards* for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee." On the basis of this text, defendant argues that its drug testing of plaintiff was a "qualification standard" that it was free under the ADA to impose against plaintiff as it would any other employee. But viewed in context of the purpose of the ADA and the accompanying sub-provisions of § 12114 that I have just discussed, I cannot agree with defendant's understanding that a drug test is itself a "qualification standard" within the meaning of this sub-provision, because the wording of this sub-provision further states that the "qualification standard" must be job-performance/behavior-related. There is no suggestion in this case that plaintiff's medicinal use of marijuana adversely would affect her job

13

performance. Moreover, defendant's interpretation is at odds with § 12114(d)(2), insofar as

defendant reads § 12114(c)(4) to authorize drug testing of applicants.

My conclusion that the ADA does not preempt PUMA's anti-discrimination employment

provision is reinforced by consideration of the ADA's preemption "savings clause":

> Nothing in this chapter shall be construed to invalidate or limit the remedies, rights,
> and procedures of any Federal law or law of any State or political subdivision of
> any State or jurisdiction that provides greater or equal protection for the rights of
> individuals with disabilities than are afforded by this chapter.

42 U.S.C. § 12201(b). The evident intent of Congress was to allow the States to enact greater

protections for parties like plaintiff who may suffer from a disability such as plaintiff's post-

traumatic stress disorder.

As the Supreme Court has acknowledged in a different context, the courts should not

presume that Congress "hide[s] elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531

U.S. 457, 468 (2001). But that is what defendant presumes that Congress has done here—that

Congress has used an exemption from the coverage scope of the ADA to preempt the States from

prohibiting other forms of employment discrimination. I cannot agree. The ADA is an anti-

discrimination statute that exempts the use of illegal drugs from its scope of protection. Beyond

doing so, the ADA does not preclude the States from regulating employers who discriminate

against employees who engage in the medicinal use of drugs in compliance with state law.

At most, defendant presents a convincing case that plaintiff could not seek relief

under the ADA for defendant's rescission of her job offer. *See, e.g.*, *James v. City of Costa

Mesa*, 700 F.3d 394, 405 (9th Cir. 2012) ("We hold . . . that the ADA does not protect

medical marijuana users who claim to face discrimination on the basis of their marijuana

use."). But the question here is not whether the ADA affords plaintiff relief. It is whether the

ADA precludes Connecticut from granting plaintiff relief. I conclude that defendant has not shown a conflict between the ADA and PUMA that would justify preemption.

### 3. Federal Food, Drug, and Cosmetic Act

Defendant further argues that PUMA is preempted by the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.*, because PUMA permits the use, dispensing, and licensing of medical marijuana, which has not been approved by the federal Food and Drug Administration. Doc. #18-1 at 22. Like the CSA, however, the FDCA does not purport to regulate employment, and my focus here is limited to the validity of PUMA's anti-discrimination-in-employment provision, § 21a-408p(b)(3). Because § 21a-408p(b)(3) neither conflicts with nor poses an obstacle to the goals of the FDCA, I conclude that the FDCA does not preempt § 21a-408p(b)(3).

In short, therefore, PUMA is not preempted by any federal laws. Accordingly, I will now turn to consider defendant's specific arguments with respect to each of the three counts of the complaint.

### Count One – Private Right of Action under PUMA

Defendant moves to dismiss plaintiff's PUMA claim under § 21a-408p(b)(3) on the ground that PUMA does not give rise to a private right of action. Both parties agree that PUMA lacks an explicit authorization for a private right of action but dispute whether there is an implied right of action.

There is a "presumption in Connecticut that private enforcement does not exist unless expressly provided in a statute." *Gerardi v. City of Bridgeport*, 294 Conn. 461, 468 (2010). Plaintiff bears the burden of overcoming this presumption. In determining whether a plaintiff has met her burden, Connecticut courts look to three factors that are known as the "*Napoletano* factors." The first factor is whether plaintiff is one of the class for whose benefit the statute was enacted. The second factor is whether there is any indication of legislative intent, explicit or

implicit, either to create a private right of action or to deny one. And the third factor is whether the recognition of a private right of action would be consistent with the underlying purposes of the legislative scheme. *See ibid.* (citing *Napoletano v. CIGNA Healthcare of Conn., Inc.*, 238 Conn. 216, 249 (1996)).

Once a plaintiff meets a "threshold showing that none of the three factors weighs against recognizing a private cause of action," courts consider "all evidence that could bear on each factor." *Gerardi*, 294 Conn. at 469. In undertaking this analysis, courts should "look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." *Provencher v. Town of Enfield*, 284 Conn. 772, 778–79 (2007). "The ultimate question is whether there is sufficient evidence that the legislature intended" to provide a private cause of action. *Id.* at 779.

Whether § 21a-408p(b)(3) provides a private cause of action is a question of first impression.[5] Applying the *Napoletano* test here, plaintiff meets the threshold showing that none of the three factors weighs against recognizing a private cause of action. With respect to the first

---

[5] This question is mostly unsettled in other States as well. The provisions in other States that are analogous to § 21a-408p(b)(3) similarly all lack express causes of action. The Rhode Island Superior Court recently determined that Rhode Island's medical marijuana statue contains an implied cause of action. *See Callaghan v. Darlington Fabrics Corp.*, 2017 WL 2321181, at *4–8 (R.I. Super. 2017). But for the most part, it appears to be an open question whether the other seven medical marijuana statutes that contain employment provisions imply a private cause of action. The Arizona Court of Appeals held that Arizona's provision did not provide a private cause of action for patients against their treating physicians; in doing so, the court contrasted the physician provision with the provision prohibiting discrimination by landlords, schools, and employers and insinuated (but did not find) that a private cause of action might exist against landlords, schools, and employers. *See Gersten v. Sun Pain Mgmt., P.L.L.C.*, 2017 WL 1382020, at *2 (Ariz. Ct. App. 2017).

The Massachusetts Supreme Court recently held that Massachusetts's medical marijuana statute, which does *not* explicitly protect employees against discrimination based on medical marijuana use, did not contain an implied cause of action to that effect either. But the Massachusetts Supreme Court, in that decision, also held that the aggrieved employee had a cause of action under a state disability discrimination statute, finding that "an exception to an employer's drug policy to permit its use is a facially reasonable accommodation" under the relevant state law. *See Barbuto v. Advantage Sales & Marketing LLC*, 477 Mass. 456, 2017 WL 3015716, at *5 (2017). The Massachusetts court emphasized that because "a comparable cause of action already exists under our law prohibiting handicap discrimination, a separate, implied right of action is not necessary to protect a patient using medical marijuana from being unjustly terminated for its use." *Id.* at *8.

factor, plaintiff is a qualifying patient and thus she certainly falls within the class for whose benefit the statute was enacted. With respect to the second factor, there is no indication of legislative intent to deny a private cause of action. To the contrary, testimony from public hearings suggests that legislators expected that the employment provision of PUMA would provide protections for employees that would be enforceable in the courts.[6] Lastly, with respect to the third factor, a private cause of action is not inconsistent with the underlying purposes of the legislative scheme but in fact effectuates the evident legislative purpose to prevent employers from discriminating against authorized medicinal users of marijuana.

Considering all that bears on each factor, I conclude that the legislature intended that § 21a-408p(b)(3) provide a private cause of action. Most importantly, without a private cause of action, § 21a-408p(b)(3) would have no practical effect, because the law does not provide for any other enforcement mechanism. "The absence of any enforcement mechanism militates in favor of authorizing a private right of action, thereby enabling those for whose benefit the statute

---

[6] *See* 55 H.R. Proc., Pt. 9, 2012 Sess., p. 177 (REP. NOUJAIM: ". . . All I am saying is this is one additional burden on employers, just one additional burden being placed on employers and – on their daily work and – and that, essentially, will hurt employers, and I do have some concerns about it."); *id.* at p. 335–36 (REP. CALENDORA: " . . . we have language here that a qualifying patient shall not be denied any right or privilege, including but not limited to. So these individuals are going to be essentially, a protected class. I'm not sure what rights and privileges they're going to assert and that's denied from their use of medical marijuana. . . . [A]nd we see broad sweeping language in here, not just affording these individuals the right to use medical marijuana, but we're affording them the right to assert all sorts of claims that we don't even contemplate. And I'm not sure that was the original intent when this bill set out. When I first heard about it, it was about allowing individuals to be able to use medical marijuana in the treatment of some debilitating illness. But what we're doing here today is creating a whole other class that can assert lawsuits against landlords, against employers, against neighbors, against classmates, under the guise of using medical marijuana. Does it become a sword? I don't think so but it certainly is going to become a shield, and yet, again, it's going to be problematic in the workforce, in the residential facilities."); *id.* at 440 (REP. CAFERO: "We have a situation is this bill that[] has been pointed out many times that says no employer can discriminate in any way . . . against any employee who happens to be participating in this program. And yet when a very practical issue came up by Representative Noujaim, a manufacturer, who says if the qualifying patient is home before coming to work administers to him or herself the medical marijuana and by its very nature comes to work impaired. If he were to say, I got to send you home, you can't work on this. He is liable for lawsuit because he's not supposed to discriminate."); 55 S. Proc., Pt. 10, 2012 Sess., p. 210 (SEN. BOUCHER: "The other costs that we have to consider are . . . [t]he cost to businesses; we have in this bill language that says businesses are prohibited from discriminating. We hopefully will talk about some protections for businesses should this program come in place, because they're really at risk.").

17

was enacted to protect the rights conferred upon them by the legislature." *Skakel v. Benedict*, 54 Conn. App. 663, 688 (1999) (implying private right of action for injunctive relief to enforce right to confidentiality under Conn. Gen. Stat. § 17a-688(c) for lack of any alternative enforcement mechanism). By contrast, other recent decisions that have declined to imply a private right of action have relied heavily on the fact that the statute created an alternative enforcement mechanism. *See Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 507–08 (2012) (no private right of action against employer under Conn. Gen. Stat. § 17a-101e for retaliation against employee who reported child abuse where statute expressly provided for right of Attorney General to bring a court action if employer violated statute); *Gerardi*, 294 Conn. at 471–72 (no private right of action against employer under Conn. Gen. Stat. § 31-48d(b)(1) for failure to give notice of employee monitoring because statute provides for enforcement of statute by the Labor Commissioner); *J.P. Alexandre, LLC v. Egbuna*, 137 Conn. App. 340, 357 (2012) (no private right of action for "taxpayer bill of rights" under Conn. Gen. Stat. § 12-39n because "the legislature expressly provided that the rights granted in § 12-39n shall be enforced by other parts of the general statutes, or by rules or regulations of the department of revenue services").

Defendant counters that PUMA delegates administrative oversight and enforcement authority to the Connecticut Department of Consumer Protection. But plaintiff correctly notes that while other sections of PUMA assign administrative authority to the Department of Consumer Protection, the text of § 21a-408p is a clear exception. *See* Doc. #27 at 27–28. In light of all these concerns, I conclude that § 21a-408p(b)(3) contains an implied private right of action.

### *Count One – Exemption under § 21a-408p(b)*

Defendant argues in the alternative that it is exempt from § 21a-408p(b) and therefore could not have violated the statute as a matter of law. *See* Doc. #18-1 at 25–28. PUMA prohibits employers from refusing to hire qualifying patients, "unless required by federal law or required to obtain federal funding." § 21a-408p(b). As a nursing facility, defendant is subject to federal regulations that require compliance with federal, state, and local laws generally. Defendant argues that because the CSA prohibits marijuana use, defendant would be violating federal law (and thus violating the federal nursing home regulations that require compliance with federal law) by hiring plaintiff. This argument borders on the absurd. Because the act of merely hiring a medical marijuana user does not itself constitute a violation of the CSA or any other federal, state, or local law, defendant is not exempt from § 21a-408p(b).

### *Count One – Equal Protection Clause*

Defendant next argues that § 21a-408p(b)(3) violates the Equal Protection Clause because it requires employers to treat one class of employees (medical marijuana users) differently than other similarly situated employees (recreational marijuana users). This argument is frivolous. "[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Keane v. Fischetti*, 300 Conn. 395, 406 (2011); *Nordlinger v. Hahn*, 505 U.S. 1, 10–16 (1992) (same). Here the legislature could rationally distinguish between favoring people who use marijuana for medicinal purposes under the careful guidance of a physician and people who use marijuana at their whim to get high. PUMA does not violate the Equal Protection Clause.

### *Count Two – Public Policy Claim*

Count Two of the complaint alleges that defendant's refusal to hire plaintiff violated the public policy of the state of Connecticut. In her opposition brief, plaintiff clarifies that this is a common law claim based on *Sheets v. Teddy Frozen Foods Inc.*, 179 Conn. 471 (1980). In *Sheets*, the Connecticut Supreme Court "recognize[d] an exception to the traditional rules governing employment at will so as to permit a cause of action for wrongful discharge where the discharge contravenes a clear mandate of public policy." *Id.* at 474. In other words, under Connecticut law, "[i]f an employer's reason for dismissal is 'demonstrably improper' because it violates some important public policy, [an at-will] employee may recover for wrongful termination." *Groth v. Grove Hill Med. Ctr., P.C.*, 2015 WL 4393020, at *9 (D. Conn. 2015).

Plaintiff seeks to extend *Sheets* to permit a cause of action for wrongful *rescission* of a job offer (as opposed to wrongful discharge) in violation of public policy. I need not decide whether *Sheets* applies in this situation, however, because "if a statute already provides a private right of action intended to vindicate the relevant public policy, the [public policy] claim will fail." *Ibid*. Because I have found that § 21a-408p(b)(3) contains a private right of action, I will dismiss plaintiff's public policy claim under Count Two of the complaint.

### *Count Three – Negligent Infliction of Emotional Distress*

Count Three of the complaint alleges a claim for negligent infliction of emotional distress. Plaintiff alleges that defendant—knowing that plaintiff suffered from PTSD—waited to rescind her job offer until one day before she was scheduled to begin work (and after she had already left her prior job), causing plaintiff to experience severe emotional distress, including anxiety, sleeplessness, and loss of appetite. The Connecticut Supreme Court has held that "[t]o prevail on a claim of negligent infliction of emotional distress, the plaintiff is required to prove

that (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Hall v. Bergman*, 296 Conn. 169, 182 n.8 (2010) (internal quotation marks and citation omitted).

A claim for negligent infliction of emotional distress cannot arise from conduct occurring in an ongoing employment relationship, as distinguished from conduct occurring in the termination of employment. *See Perodeau v. City of Hartford*, 259 Conn. 729, 749 (2002); *see also Spano v. Gengras Motor Cars, Inc.*, 663 F. Supp. 2d 75, 83–84 (D. Conn. 2009).  But *Perodeau* did not address employment-related conduct that qualifies as neither "occurring in an ongoing employment relationship" nor "occurring in the termination of employment," such as an employer's decision to rescind a job offer.

Since *Perodeau*, Connecticut courts have not squarely decided whether a rescinded job offer could serve as the basis for a negligent infliction of emotional distress claim. The practical, workplace-related reasons set forth in *Perodeau* for precluding a claim for negligent infliction of emotional distress on the basis of events occurring in an ongoing employment relationship do not apply in the context of an employer who rescinds a job offer before the prospective employee can begin work. *See Perodeau*, 259 Conn. at 758. Because the withdrawal of a job offer is more akin to termination than to conduct occurring in an ongoing employment relationship, it seems consistent with *Perodeau* that a claim for negligent infliction of emotional distress could arise from the withdrawal of a job offer.

Plaintiff has otherwise alleged the basic elements for a claim of negligent infliction of emotional distress. She alleges that defendant's conduct in withdrawing her offer was

unreasonable, that defendant should have realized that its conduct involved an unreasonable risk of causing severe emotional distress (particularly because she alleges that defendant knew she had PTSD), and that defendant's conduct did in fact cause her such distress. I will therefore deny the motion to dismiss as to Count Three.

### Plaintiff's Request for Attorney's Fees

Defendant argues that plaintiff's request for attorney's fees and costs (*see* Doc. #1-2 at 8) must be stricken as a matter of law, because plaintiff has failed to allege a statutory or contractual provision that provides such relief. Doc. #18-1 at 33–34. Plaintiff responds that defendant's request is premature and that plaintiff could ultimately receive attorney's fees through a punitive damages award. "At the motion to dismiss stage, plaintiffs need not prove that they are entitled to each form of relief sought, so long as they have adequately plead the underlying claim." *SRSNE Site Grp. v. Advance Coatings Co.*, 2014 WL 671317, at *2 (D. Conn. 2014); *see also ibid.* (holding that "courts in this circuit have denied a defendant's motion to strike or to dismiss claims for attorney's fees . . . because dismissal of such claims at the pleading stage would be premature"). Accordingly, I will deny defendant's motion to strike without prejudice to later renewal.

## CONCLUSION

For the reasons explained above, defendant's motion to dismiss (Doc. #18) is GRANTED in part and DENIED in part. The motion is granted as to Count Two (violation of public policy), and denied as to Count One (violation of Conn. Gen. Stat. § 281-408p(b)(3)) and Count Three (negligent infliction of emotional distress).

It is so ordered.

Dated at New Haven this 8th day of August 2017.

/s/ *Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge