**UNITED STATE DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KATELIN NOFFSINGER, | :     CIVIL ACTION NO. |
| | : |
|              Plaintiff, | :     3:16-CV-01938 (JAM) |
| v. | : |
| | : |
| SSC NIANTIC OPERATING COMPANY LLC, | : |
| d/b/a BRIDE BROOK HEALTH & | : |
| REHABILITATION CENTER, | : |
| | : |
|              Defendant. | :     NOVEMBER 9, 2017 |
| | : |

**MEMORANDUM OF LAW IN SUPPORT OF THE PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.    INTRODUCTION

Plaintiff Katelin Noffsinger ("Plaintiff" or "Noffsinger") is a "qualifying patient" under Connecticut's medical marijuana program.[1]  In July 2016 she was offered a position as the Activity Manager by Defendant SSC Niantic Operating Company LLC d/b/a Bride Brook Health & Rehabilitation Center ("Bride Brook" or "Defendant"), a long-term nursing and rehabilitation center located in Niantic, Connecticut.  Noffsinger accepted the position and subsequently participated in a pre-employment background check and drug screening at which time she disclosed her status as a "qualifying patient" to the Defendant.  Because the Plaintiff uses medical marijuana pursuant to Connecticut state law her drug screening tested positive for marijuana.  The Defendant then withdrew its job offer because of the Plaintiff's drug test result.

---

[1]    Palliative Use of Marijuana Act, hereinafter "PUMA", codified as Connecticut General Statute § 21a-408 *et seq.*

C.G.S. §21a-408p(b)(3), the employment discrimination provision of PUMA, prohibits an employer in the state of Connecticut from refusing to hire an individual because of their status as a "qualifying patient" under the Palliative Use of Marijuana Act ("PUMA"). By rescinding its job offer to Noffsinger because she tested positive for marijuana, the Defendant refused to hire her solely because of her participation in PUMA and her status as a "qualifying patient." The Plaintiff subsequently filed suit in Connecticut state court alleging that she had been discriminated against by the Defendant because of her status as a "qualifying patient" when the job offer was rescinded. The Defendant removed the case to federal court on the basis of diversity jurisdiction and filed a motion to dismiss. The Defendant argued that Connecticut's medical marijuana law was preempted by a host of federal laws, including the Controlled Substances Act, the American with Disabilities Act, and the Food, Drug and Cosmetic Act, as well the Equal Protection Clause of the U.S. Constitution. This Court dismissed the Defendant's motion and found a private right of action under PUMA permitting the Plaintiff's case to go forward.

Based on the undisputed facts and the argument set forth below and in the Plaintiff's Rule 56(a) Statement, the Plaintiff respectfully requests that this Court find that there are no material issues in dispute, the Defendant's action unlawful and grant the Plaintiff's motion for summary judgment on Count One of the Complaint.

II.   **FACTS**

Bride Brook is a skilled nursing and rehabilitation care facility in Niantic, Connecticut which provides short-term, long-term or end-of-life care for its residents. (Deposition Testimony of Lisa Mailloux at p. 11 attached as Exhibit B to Plaintiff's Rule

56(a) Statement of Undisputed Facts, hereinafter "SUF Ex. ___, p. ___").  Bride Brook

is part of a larger health and rehabilitation corporation, Sava Senior Care with

headquarters in Atlanta, Georgia (SUF, Ex. B at 9-10).  Bride Brook employs nearly 200

employees in a variety of classifications in a number of departments including dietary,

physical and recreational therapy and nursing (SUF, Ex. B at 28).  In July 2016, the

Defendant posted an opening for its Activity Manager on *indeed.com*, an on-line job

search engine (SUF, Ex. B at 20).  Ashley Fridinger, the former Activity Manager who

was then holding another position at Bride Brook, learned about Katelin Noffsinger from

her network of contacts in the industry (SUF, Ex. B at 21-23; SUF Ex. A at 50-51).  At

that time the Plaintiff was working as the assistant recreation director at a nursing facility

in Bloomfield, Connecticut (SUF Ex. A at 28; SUF Ex. C).  Fridinger subsequently

contacted the Plaintiff on July 12, 2016, and asked her if she was interested in in the

Activity Manager position.  Noffsinger said she was and emailed Fridinger her résumé

(SUF ¶ 2; Ex. C).

Noffsinger and Lisa Mailloux, the Defendant's Administrator, arranged to meet for

an in-person interview at the facility on July 18, 2016.  At that meeting Mailloux and

Noffsinger spent nearly an hour talking about Bride Brook's unique characteristics,

Noffsinger's work experience and training, and why she wanted to come to work at the

facility in the Activity Manager role (SUF, Ex. B at 25-27).  They explored in detail many

areas, including the patient population mix at Bride Brook, its conservator services, the

various departments and what the various departments and employees did at Bride

Brook, and the duties and responsibilities of the Activity Manager (SUF Ex. B at 26;

SUF Ex. A at 62).  The Activity Manager heads up the recreation department at Bride

Brook, which develops and implements various age and health appropriate activities for various patient populations throughout the facility (SUF, Ex. B at 28).  After the interview, Noffsinger and Mailloux toured the facility, where the Plaintiff met staff and department heads throughout Bride Brook, including in housekeeping, dietary, maintenance, nursing, admissions, and physical therapy (SUF, Ex. B at 29).  On the basis of Noffsinger's résumé, her interview and the feedback she received from staff at the facility, Mailloux offered the Noffsinger the Activity Manager job (SUF, Ex. B at 32-33; SUF Ex. A at 61, 68).[2]

Mailloux believed that Noffsinger was a "good fit" for the position (SUF, Ex. B at 32-34).  She met the qualifications for the position both in terms of her education and her work experiences.  Importantly, Mailloux was particularly drawn to the fact that Noffsinger had a "diverse background."  Noffsinger had a lot of experience dealing with patients with severe cognitive and psychiatric issues and Mailloux expected she could tailor the recreation programs to address patients with those needs as well as the general geriatric population at Bride Brook (SUF, Ex. B at 32-34).

Following Noffsinger's acceptance of the job, Mailloux drafted an offer letter to provide to Noffsinger when the Plaintiff returned to Bride Brook to fill out paperwork for a background check and supply a urine specimen for a pre-employment drug test (SUF, Ex. B at 38-39, 42; SUF, Ex. C; SUF, Ex. D; SUF, Ex. E).  Mailloux forwarded a copy of

---

[2]      Mailloux testified that she offered the job to Noffsinger the next day following an interview she conducted with the individual holding the Activity Manager position on a temporary basis (SUF, Ex. B at 31-33).  Noffsinger testified that Mailloux offered her the job at the conclusion of the interview on July 18 (SUF, Ex. A at 61).  Both of them agree that Noffsinger accepted the position the following day in a telephone conversation with Mailloux (SUF, Ex. B at 34; SUF, Ex. A at 70).  Given Mailloux's conclusion that Noffsinger was the right person for the job, it is likely she did offer the position to her in the interview but told her she had to go through the motions of the other interview.  In any event ,any discrepancies in these recollections are immaterial to the essential fact that Noffsinger was offered the job by the Defendant and accepted that offer.

the draft offer letter to Terri Taylor, her regional human resources representative, who congratulated Mailloux for filling the job posting and hiring Noffsinger (SUF, Ex. F). Between July 19, 2016, and July 22, 2016, Noffsinger and Mailloux communicated frequently by email to arrange a date and time for the Plaintiff to come back to complete the pre-employment requirements and eventually settled on July 25, 2016 at 5 p.m. (SUF, Ex. A at 74-75; SUF, Ex. B at 41; SUF, Ex. D).

On July 25, 2016, at the beginning of the meeting, Noffsinger disclosed to Mailloux that she was a "qualifying patient" under Connecticut's medical marijuana program and that her doctor had prescribed the use of medical marijuana to relieve symptoms, specifically night terrors, associated with her diagnosis of post-traumatic stress disorder (PTSD) (SUF, Ex. A at 75; SUF, Ex. B at 50-52; SUF, Ex. E at ¶ 12). Noffsinger explained that she only took the medical marijuana in the evening to help her sleep.  Noffsinger also brought along to the meeting her PUMA registration card from the Department of Consumer Protection (DCP) and an empty prescription vial to show Mailloux the form in which she ingested the medical marijuana (Ibid.; SUF, Ex. A at 61). Noffsinger did not use marijuana recreationally, and prior to becoming a qualifying patient had used marijuana only one other time in her life, while a senior in high school (SUF Ex. A at 100).  Following this disclosure, Noffsinger and Mailloux proceeded to process the background check paperwork and collect a urine specimen for the drug screening which would be conducted by a third-party vendor, Alere Toxicology Services ("Alere") (SUF Ex. E ¶ 16).  The specimen collection cup provides an initial test result at the time the specimen is gathered and that result is recorded by the individual collecting the sample.  Not surprisingly, the initial result showed Noffsinger's specimen positive for

marijuana and that result was recorded on the On-site Custody and Collection Form by Mailloux and then sent off for further processing to Alere (SUF, Ex. B at 50; SUF, Ex. G).  On the next day following the collection of the urine sample and Noffsinger's disclosure of her status as a qualifying patient, Mailloux expressed, for the first time, her reluctance to hire the Plaintiff in an email to her regional HR manager, Terri Taylor (SUF, Ex. H).

In the one week period following Noffsinger's disclosure of her status under PUMA and her initial positive result to marijuana in the drug screening, Mailloux was in email contact with both Taylor, the regional HR manager, and the Defendant's regional compliance officer, Kate Warren, regarding the Plaintiff's drug test results.  On August 1, 2016, following the confirmation of the positive marijuana result by Alere and its review by the Medical Review Officer, Warren informed Mailloux and Taylor that because of the "positive" test result for marijuana Noffisinger would be "disqualified" from hiring by Bride Brook (SUF, Ex. I; SUF, Ex. B at 66).  On August 2, 2016, at approximately 3:30 p.m., Noffsinger received a telephone call from an Alere employee who reported that her drug screen had come back positive for "marinol."  She immediately called Mailloux, got her voice mail and left a message that Alere had confirmed that the only drug in the sample was marijuana (SUF, Ex. A at 83-85).  Approximately fifteen minutes later, Mailloux returned the call to Noffsinger and informed her that, because of the positive test result, Bride Brook was rescinding its previous offer of employment (SUF, Ex. A at 85; SUF, Ex. B at 69; SUF, Ex. E ¶ 20).

III.   **SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56(a) directs that when considering a motion for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986), quoting Fed. R. Civ. P. 1. A factual dispute is genuine "if...a reasonable jury could return a verdict for the nonmoving party" and a "material fact" is one whose resolution will affect the ultimate disposition of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Larkin v. Town of West Hartford,* 891 F. Supp. 719, 723 (D. Conn. 1995), aff'd without opinion, 101 F. 3d 109 (2d Cir. 1996).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. However, "[t]he mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003). "[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248; *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002). A nonmoving party may not rely on mere allegations, legal conclusions, unsupported statements, denial of the pleadings, or inadmissible hearsay. *Celotex*, 477 U.S. at 327; *Burlington Coat Factory*

*Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir. 1985).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson,* 477 U.S. at 247-48 (italics in original).  "[T]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."  *Meiri v. Dacon,* 759 F. 2d 989, 998 (2d Cir.), *cert denied*, 474 U.S. 829 (1985).  See also, *Bickerstaff v. Vassar College*, 196 F.3d 435, 451 (2d Cir. 1999), cert. denied, 530 U.S. 1242 (2000).

## IV.   ARGUMENT

### A.   Connecticut law provides employment discrimination protections for "qualifying patients" in its Medical Marijuana program that are enforceable at law.

Connecticut, along with eight other states,[3] provides explicit employment discrimination protections for patients participating in the medical marijuana programs in those states.  PUMA, in addition to exempting "qualifying patients", caregivers and doctors from state criminal penalties applicable to those that use or distribute marijuana, specifically protects individuals from discipline, discharge or a refusal to hire based on their status as a "qualifying patient."  C.G.S. § 21a-408p(3) provides that:

> (3) No employer may refuse to hire a person or may discharge, penalize or threaten an employee solely on the basis of such person's or employee's status as a qualifying patient or primary caregiver under sections 21a-408 to 21a-408n, inclusive. Nothing in this subdivision shall restrict an employer's ability to prohibit the use of intoxicating substances during work hours or restrict an employer's ability to discipline an employee for being under the influence of intoxicating substances during work hours.

---

[3]     See, *Ruling on Defendant's Motion to Dismiss,* (Document 48), f/n 1, p. 2.

These prohibitions in PUMA against employment discrimination mirror the provisions against similar discriminatory employer action found in every single federal or Connecticut state law extending employment protections to individuals based on their membership in a protected class.[4]  Such remedial statutes, like § 21a-408p(3) of PUMA, are intended to permit individuals to participate in the workforce on an equal footing with other employees outside the protected class and prohibit employers from impermissibly using membership in a protected class when making employment decisions.  The clear policy choice made by the Connecticut General Assembly at the time it enacted PUMA, as reflected in the clear language of § 21a-408p(3), was to make clear to employers that an individual's status as a "qualifying patient" was to play no role in employment decisions, including hiring.

When the General Assembly enacted PUMA, it assigned the overall responsibility of administering the statute's complex regulatory framework to the state Department of Consumer Protection ("DCP").  Notably, however, it did not assign the enforcement of the employment discrimination provisions of § 21a-408p(b)(3) to DCP or any other administrative agency.  Based on an evaluation of the three factors set forth in *Napoletano v. CIGNA Healthcare of Connecticut,* 238 Conn. 216, 249 (1996), for determining whether the legislature, in the absence of providing an explicit statutory remedy, intended to imply a private right of action for enforcement, this Court determined that the Connecticut General Assembly intended that § 21a-408p(b)(3) provides a private cause of action for its enforcement.  *Ruling on Defendant's Motion to Dismiss,* August 8, 2017, p. 17 (Document 48), ("Most importantly, without a private

---

[4]        See, for example, *Connecticut Fair Employment Practices Act (CFEPA),* C.G.S § 46a-60a(1); *Title VII of the Civil Rights Act of 1964,* 42 U.S.C. § 2000e-2(a)(1); *Age Discrimination in Employment Act (ADEA),* 29 U.S.C. § 623(a); *Americans with Disabilities Act,* 42 U.S.C. § 12112(a)(1).

cause of action, [the statute] would have no practical effect, because the law does not provide for any other enforcement mechanism.")

**B.     The Defendant rescinded its job offer to the Plaintiff solely Because of her status as a "qualifying patient" using medical marijuana under PUMA**

It is abundantly clear from the undisputed evidence in this case that the only reason the Defendant withdrew its previous proffered job offer was because of the Plaintiff's status as a "qualifying patient" under PUMA.  In doing so, the Defendant violated Connecticut law.

Based on Katelin Noffsinger's experience and qualifications, as set forth in her résumé, and the interview conducted on July 18, 2016, Lisa Mailloux confidently hired the Plaintiff for the position of Activity Manager at Bride Brook.  Mailloux was impressed with Katelin's "diverse background" and her experience working with patients with severe cognitive issues.  She also valued the experience Katelin had at Touchpoints, her then current employer, with patients suffering severe psychiatric illnesses. Importantly, Mailloux was further impressed with Katelin's knowledge of how to tailor programs for those kinds of patients as well as with geriatric patients. She felt that Katelin was a "good fit" and this conclusion was supported by the feedback she received from other employees who had met or talked with Katelin during the tour of the facility.  As a consequence, Mailloux made the decision to hire Noffsinger and offered her the job.  Mailloux communicated her decision to both the individual in charge of conducting background checks for new hires and to the director of nursing (SUF, Ex. B at 33).  Mailloux was clearly excited that Noffsinger was taking the job and communicated that to her Regional Human Resources representative, Terri Taylor,

when she sent her a draft offer letter to review on July 20, 2016.  That excitement and enthusiasm all changed five days later.

At the meeting on July 25, 2016, to review and sign the offer letter, process paperwork for a background check and submit a urine sample for a drug screening, Noffsinger disclosed to Mailloux that she was a qualifying patient under PUMA using medical marijuana to treat symptoms related to PTSD.  Noffsinger explained that she only took a capsule of synthetic marijuana in the evening to help her sleep and offered to show Mailloux her certification from DCP and an empty vial of her medication. Although Mailloux declined those offers, she had no reason to doubt what Noffsinger was telling her was true.  Noffsinger's use of medical marijuana was confirmed that same day when her initial result from the urine specimen she provided showed a positive test for marijuana.  It was *only after* her disclosure of her status as a qualifying patient and the positive test for medical marijuana that the Defendant, through its agents, expressed any reluctance to hire the Plaintiff as Activity Manager at Bride Brook.  Mailloux communicated that very reluctance the next day in an email to Taylor, the regional HR manager.

Indeed, the Defendant does not deny that it rescinded its offer of employment because of the positive test result for marijuana.  Importantly, the Plaintiff has testified that she does not use illegal drugs and that she used marijuana recreationally only once in her life, as a senior in high school.  Mailloux believed that the Plaintiff was using medical marijuana pursuant to the statute.  Therefore, her positive test result was clearly attributed, by the Defendant's beliefs and actions, to her status as a "qualifying patient."  The Defendant's regional compliance officer specifically admitted that the

Defendant ignored the requirements of Connecticut's laws when making employment decisions based on the results of drug screenings.  Because of that stance, any drug screening results for a "qualifying patient" would always lead to both a positive result for marijuana and a concomitant refusal to hire by the Defendant.  That is clearly what happened with respect to the Plaintiff.

### C.   There are no material facts in dispute regarding the reason the Defendant rescinded its job offer to the Plaintiff.

The facts of this case are extremely uncomplicated and undisputed.  The Plaintiff was qualified for and offered a job heading up Bride Brook's Recreation Department.  At her second meeting with Mailloux to process pre-employment documents she disclosed her status as a "qualifying patient" under the medical marijuana statute.  Her drug screening specimen she provided at that meeting tested positive for marijuana.  The drug screen analysis subsequently performed by Alere and reviewed by the MRO confirmed that her test was positive for THC.  Her positive test for marijuana is due to her participation as a "qualifying patient" under PUMA.  The Defendant subsequently rescinded its offer of employment solely because of the test results.

### D.   The Defendant's action in rescinding the job offer to the Plaintiff was Unlawful

From the undisputed facts in this case it is clear that the Defendant's actions violated C.G.S. § 21a-408p(3).  The statute prohibits employment discrimination against "qualifying patients" in hiring due solely to that status.  Because of her status as a "qualifying patient" the Plaintiff uses medical marijuana.  Because of her use of medical marijuana her pre-employment drug screen showed positive for that drug.  Because of that test result, and only for that reason, the Defendant rescinded its job offer.  That act

by the Defendant is precisely what the statute prohibits.  As a result the Plaintiff is entitled to judgment on Count One as a matter of law.

## V.    CONCLUSION

For all the reasons set forth above, the Plaintiff respectfully requests that this Court grant her Motion for Partial Summary Judgment on Count One of her Amended Complaint and find that, as a matter of law, the Defendant has violated Connecticut General Statute § 21a-408p(b)(3).

Respectfully submitted,

PLAINTIFF, KATELIN NOFFSINGER

By:    _____/s/ Henry F. Murray_____
Henry F. Murray (ct17234)
Gregg D. Adler (ct05698)
LIVINGSTON, ADLER, PULDA, MEIKLEJOHN
  & KELLY, P.C.
557 Prospect Avenue
Hartford, CT  06105
T: 860.233.9821
F: 860.232-7818
Email – hfmurray@lapm.org
          gdadler@lapm.org

## **CERTIFICATION**

I hereby certify that on the 9th day of November, 2017, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic filings.  Parties may access this filing through the Court's CM/ECF System.

_____/s/ Henry F. Murray_____
Henry F. Murray