**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KATELIN NOFFSINGER, | : |
| | : Case No. 3:16-cv-1938-JAM |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| SSC NIANTIC OPERATING COMPANY, | : |
| LLC d/b/a BRIDE BROOK HEALTH & | : NOVEMBER 17, 2017 |
| REHABILITATION CENTER, | : |
| | : |
| Defendant. | : |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56 of the Local

Civil Rules of the United States District Court for the District of Connecticut, defendant SSC

Niantic Operating Company, LLC d/b/a Bride Brook Health & Rehabilitation Center ("Bride

Brook") respectfully moves for summary judgment on Counts One and Three[1] set forth in the

Amended Complaint dated October 17, 2016 (Doc. No. 1, at Exhibit B) as there are no material

facts at issue, and Bride Brook is entitled to summary judgment as a matter of law on the claims

asserted therein.

**I.     PRELIMINARY STATEMENT**

In this action, Plaintiff Kaitlin Noffsinger ("Ms. Noffsinger" or "Plaintiff") seeks to

recover damages arising from Bride Brook's decision to rescind an offer of employment.  In

Count One, Plaintiff purports to state a claim for violation of Conn. Gen. Stat. § 21a-408p –

---

[1] As discussed herein, the Court previously dismissed Count Two of Plaintiff's three-count complaint.

1

Connecticut's Palliative Use of Marijuana Act ("PUMA" or "Act").  Pursuant § 21a-408p(b) of

the PUMA, an employer like Bride Brook that is required to implement a drug free workplace in

order to receive federal funding is exempt from the requirements of § 21a-408p(b)(3).  Bride

Brook, a Medicare and Medicaid contracted facility, is required to enforce the requirements of

the federal Drug Free Workplace Act, and is exempt from liability under the PUMA.

Accordingly, Bride Brook is entitled to judgment as a matter of law as to Count One of the

Amended Complaint.

   In Count Three of the Amended Complaint, Plaintiff purports to bring a claim for

negligent infliction of emotional distress on the grounds that Bride Brook unlawfully rescinded

the job offer. While Bride Brook maintains that it lawfully rescinded the offer of employment for

which liability may attach under the PUMA, even if the Court finds that its decision was

unlawful, a claim for negligent infliction fails regardless matter of law because the mere

revocation of an offer of employment, even if wrongful, is not by itself enough to sustain a claim

for negligent infliction of emotional distress.  *See Parsons v. United Technologies Corp.*, 243

Conn. 66, 88, 700 A.2d 655 (1997).  Further, it is indisputable that Bride Brook's conduct in

rescinding the offer of employment was nothing less than professional and courteous, and no

jury could find that Bride Brook's conduct was beyond the bounds of socially tolerable behavior

or done in an inconsiderate, humiliating, or embarrassing manner. Thus, Bride Brook is entitled

to judgment as a matter of law as to Count Three of the Amended Complaint.

   Finally, even in the event the Court declines to grant judgment for the Defendant on

Count One and/or Count Three, Plaintiff is not entitled to punitive relief or attorneys' fees and

costs as requested in Paragraphs 4 and 5 of the Amended Complaint's Demand for Relief.

Plaintiff affirmatively stated that she alleges nothing more than negligent conduct by Bride

2

Brook, and because the undisputed facts demonstrate that no jury could find that Bride Brook acted with outrageous, extreme or evil conduct, Plaintiff could not be awarded common-law punitive damages.  Further, because common-law punitive damages are limited to attorneys' fees and costs, the claims are redundant and both must be stricken.  Finally, Plaintiff has not alleged and cannot allege any violation of any statute or contract provision that would authorize attorneys' fees and/or costs.  Accordingly, these claims for relief must be stricken or dismissed as a matter of law.

## II.    BACKGROUND

Bride Brook is a skilled nursing facility located in Niantic, Connecticut that consists of 130 beds; 87 long-term-care bed and 43 short-term beds.  *See* Defendant's Local Rule 56(a)1 Statement ("Defendant's 56(a)1"), at ¶ 1.   The patients who stay with Bride Brook range from short-term rehabilitation as well as long-term patients who suffer from dementia, Parkinson's disease, heart disease, and other severe medical problems.  *Id*. at ¶ 1. Services provided to many of Bride Brook's patients are funded through Title XIX Medicaid and the U.S. Department of Veterans Affairs. *Id., * at **Exhibit A**, at 13:10-17. Because Bride Brook employees care for such a vulnerable population, it has a comprehensive Substance Abuse and Testing Policy for all of its current and prospective employees, which provides that "applicants or employees may not test positive for the use of Illegal Drugs or alcohol." *Id.* at ¶ 2, **Exhibit L**. "Illegal Drugs" under the Policy means any drug that is not legally obtainable in accordance with Federal law."[2] *Id.* The policy further states that "offers of employment will be conditional upon passing substance abuse testing."  *Id.*

---

[2] As discussed in below and in Bride Brook's Memorandum of Law in Support of Motion to Dismiss (Doc. No. 18) marijuana is an illegal substance under Federal law.

In July of 2016, Bride Brook posted a listing for the position of Activity Manager. Plaintiff's previous co-worker, Bridget Finney, was originally recruited for the position by a Bride Brook employee. *Id.* at ¶ 3.  Ms. Finney was not interested in the position, but she did refer Plaintiff for the position.  *Id.* at ¶4; *see also* **Exhibit B**, 50:10 – 51:15.  In response, Ms. Noffsinger submitted her resume via email for consideration for the position and Bride Brook invited her to its facility to meet with Bride Brook's Administrator, Lisa Mailloux ("Ms. Mailloux"), for an interview on July 18, 2016 *Id*. at ¶5.

During the July 18, 2016 interview, Ms. Mailloux explained to Ms. Noffsinger the nature of the position as well as the requirements for employment at Bride Brook, which included successful completion of background check, fingerprinting and drug-screening.  *Id*. at ¶6.  At no time during that interview did Plaintiff disclose to Ms. Mailloux that she used medical marijuana or that she was a qualifying patient.  *See id.,* at **Exhibit B**, at 60:21 – 61:1.  After the interview, Bride Brook offered Plaintiff the position, subject to certain pre-employment screenings.  Ms. Noffsinger later called Ms. Mailloux and verbally accepted the job offer. *Id.* at ¶7.

Following Plaintiff's verbal acceptance of the position, Ms. Mailloux followed up via email on Wednesday, July 20, 2016, again restating the requirements that must be completed prior to her first day of work.  *Id.* at ¶11. "I do have paperwork to review in addition to an offer letter. Please let me know when you are available to stop by. We will need *as you know* a background check and fingerprints / drug test to be initiated ASAP." *Id*. (emphasis added). Ms. Mailloux was excited that Plaintiff accepted the position and, while she acknowledged that Plaintiff would need to give a two week notice, she kindly requested that Plaintiff attend orientation on August 3, 2016 "if possible." *Id.* at ¶8.  Bride Brook facility conducts pre-scheduled orientation training every other week. *Id.* at ¶9.  If plaintiff did not attend the August

4

3, 2016 pre-scheduled orientation, she would have to wait two weeks after the August 3 training

for the next orientation before she could start.

Ms. Noffsinger and Ms. Mailloux ultimately agreed to meet the following Monday, July

25, 2016 to complete the drug screening, finger printing and background check. *Id.* at ¶ 11.

Accordingly, on Monday July 25, 2016, Ms. Noffsinger returned to Bride Brook as planned to

complete her pre-employment drug screening and paperwork to complete her background check.

When she arrived, Plaintiff disclosed that she regularly used medical marijuana "for night terrors

secondary to a motor vehicle accident", and that she possessed a Connecticut Registration

Certificate for her status as a qualifying patient. *Id.* at 13.  Ms. Mailloux responded that she

would still have to collect the pre-employment drug screening as required by Company policy.

*Id.* at ¶14. Plaintiff then submitted a urine sample for the mandatory pre-employment drug

screening. *Id.*  After the sample was collected, Bride Brook explained to Plaintiff that the

specimen would be sent to Alere Toxicology for testing and they would contact her directly with

the results.  Alere Toxicology is a third-party toxicology company which provides Bride Brook

with the drug kit and analyzes the specimens for Bride Brook.  *Id.* at ¶12.  Pursuant to standard

procedure, once a specimen is collected from the prospective employee, Bride Brook sends the

specimen via FedEx to Alere Toxicology, which is exactly what Ms. Mailloux did with Ms.

Noffsinger's drug test.  *Id.* at ¶15.

Also during said July 25, 2016 meeting, Bride Brook presented Ms. Noffsinger with a

letter offer of employment, dated July 22, 2016, signed by Lisa Mailloux, which stated: "I am

pleased to offer you the position of Activities Manager for Bride Brook Health & Rehabilitation

Center ….  This offer letter is contingent on successful completion of background check,

fingerprinting, drug screening and other pre-employment requirements." *Id.* at ¶16.  Importantly,

Ms. Noffsinger acknowledged and accepted the terms of employment and signed the letter on July 25, 2016.  *Id.*

Throughout the following week, Ms. Noffsinger contacted Ms. Mailloux numerous times regarding her drug test results because she had not received a call from Alere Toxicology.  *Id.* at 17-18.  Each time, Ms. Mailloux promptly looked into the status of her results and courteously responded to Ms. Noffsinger within an hour. *Id.* at ¶ 16-17.

On August 2, 2016, 

*Id.* at ¶ 19.

*Id.* at ¶19.  Thereafter, Ms. Noffsinger called Ms. Mailloux to inform her that she tested positive for marijuana. *Id.* at ¶ 19. At that time, Ms. Mailloux informed Plaintiff that "[Bride Brook] had to rescind the offer because of the result of her drug screen did not meet criteria." *Id.* at ¶20.  Shortly thereafter, Plaintiff instituted the instant action against Bride Brook. *See* Complaint, dated August 22, 2016 (Doc. No. 1, Exhibit A).

Lastly, this Could should take notice that Ms. Noffsinger continues to prosecute this civil action while simultaneously prosecuting an employment discrimination action against Bride Brook with the Connecticut Commission on Human Rights and Opportunities (the "CHRO Action").  In the CHRO Action, Ms. Noffsinger claims that Bride Brook refused to hire her because of her previously diagnosed post-traumatic stress disorder. *See Id.,* at ¶ 21.

## III.    LEGAL STANDARD AND ARGUMENT

Summary judgment is proper "if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is not genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In moving for summary judgment against a party who will bear the burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."). In order to defeat summary judgment, the non-moving party must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) ("There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

## A.  Defendant is Exempt from Conn. Gen. Stat. § 21a-408p and Judgment Must Be Awarded for Defendant as to Count One

Count One of the Amended Complaint claims that Bride Brook violated Conn. Gen. Stat. § 21a-408p of the PUMA when it declined to hire Plaintiff after she failed a drug test as a condition of her pre-employment. This claim fails as a matter of law because Conn. Gen. Stat. § 21a-408p provides a very specific exception:

(b) *Unless required by federal law or required to obtain federal funding*:

(3) No employer may refuse to hire a person … solely on the basis of such person's … status as a qualifying patient …

7

Conn. Gen. Stat. § 21a-408p(b) (emphasis added). The Connecticut legislature carved out a specific exception for employers who must enforce a drug-free workplace as required by federal law and in order to obtain federal funding. Bride Brook, a Medicaid and Medicare Contracted facility, is a recipient of federal funds and is a contractor with the Federal government. *See* Defendant's 56(a)1, at ¶ 20.  Thus, Bride Brook must follow the Drug-Free Workplace Act of 1988.  At a minimum, the Drug-Free Workplace Act requires employers to implement a drug and alcohol-free work environment for all its employees and potential employees. That Act further requires employers to establish a drug-free awareness program and to make a good faith effort to continue and maintain a drug-free workplace. 42 U.S.C. § 8102 (a)(1)(G).  Employers must demonstrate their intentions and actions toward maintain a drug-free workplace. Failure to comply with terms of the Drug-Free Workplace Act may result in a variety of penalties, including suspension or termination of the contract or being prohibits from applying for future contracts or grants.  *See* 42 U.S.C. §8102(b).

   In order to comply with the Drug-Free Workplace Act requirements, Bride Brook established the Substance Abuse and Testing Policy, which is a zero tolerance policy for the use of alcohol and controlled substances and includes pre-employment drug-screening. "Applicants or employees may not test positive for the use of Illegal Drugs or alcohol … 'Illegal Drugs' means any drug that is not legally obtainable in accordance with Federal law" Defendant's 56(a)1, at ¶ 2.  Federal law clearly prohibits the use of marijuana, as the "Controlled Substances Act designates marijuana as contraband for any purpose; in fact, by characterizing marijuana as a Schedule I drug, Congress expressly found that the drug has no acceptable medical use." *Gonzales v. Raich*, 545 U.S. 1, 27 (2005); *see* 21 U.S.C. § 844(a).

Conn. Gen. Stat. § 21a-408p specifically provides an exception for employer that must comply with federal laws promulgating legislation inconsistent with §21a-408p(b). Accordingly, Bride Brook was well within the law to decline to hire Plaintiff after Plaintiff tested positive on her pre-employment drug screening test *(see* Amend. Compl. at ¶¶ 16-17, 19) in order to comply with the Drug-Free Workplace Act and regulations mandating that Bride Brook prohibit the illegal use of drugs.  Bride Brook's Substance Abuse and Testing Policy prohibits the use of all controlled substances listed in Schedule I (including marijuana) of the Controlled Substances Act, and that an applicant is ineligible for hire if she tests positive. The undisputed facts here are virtually identical to the matter *Donna Smith v. Presbyterian Healthcare Services*, D-202-CV-2014-03906 (N.M. 2nd Judicial District, Aug. 26, 2015), a recent case wherein the court granted summary judgment for the Defendant, federal contractor hospital, on the grounds that it must comply with the Federal Drug-Free Workplace Act of 1988.

Moreover, Bride Brook's employment of Ms. Noffsinger, an admitted user of illegal drugs under Federal law, would be in violation of the Federal False Claim Act, 31 U.S.C. §§ 3729 *et seq*., which imposes liability on persons and companies, typically federal contractors, who defraud government programs.   As discussed above, Bride Brook, as a federal contractor, must comply with federal law and it would defraud the Federal government by employing an admitted user of an illegal drug.  Accordingly, judgment must enter in Bride Brook's favor on Count One of the Amended Complaint.

### B.  Defendant Is Entitled To Judgment As A Matter Of Law On Plaintiff's Claim Of Negligent Infliction Of Emotional Distress

In order to sustain a claim of negligent infliction of emotional distress, a plaintiff must allege and prove that "(1) the defendant's conduct created an unreasonable risk of causing the

plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 444 (2003). While Plaintiff recites the elements of this claim in Count Three of her Complaint, she does not and cannot allege any facts sufficient to support a plausible claim of negligent infliction of emotional distress.  Summary judgment must be entered in favor of Bride Brook on Count Three of the Amended Complaint claiming negligent infliction of emotional distress because Bride Brook's conduct did not involve an unreasonable risk and Plaintiff's purported distress was not foreseeable.

### 1.Defendant's Conduct Did Not Involve An Unreasonable Risk

As this Court previously stated, "because the withdrawal of a job offer is more akin to termination than to conduct in an ongoing employment relationship, it seems consistent with *Perodeau* that a claim for negligent infliction of emotional distress could arise from the withdrawal of a job offer." Ruling on Motion to Dismiss (Doc. No. 48, at p. 21).  Even analyzing this claim in the same standard set forth for termination of employment, Plaintiff cannot set forth any evidence from which a jury could reasonably conclude that Bride Brook's *conduct* in revoking a job offer was unreasonable.

"[T]o plead a legally sufficient cause of action, the alleged facts must establish that, the manner of the plaintiff's termination from employment was different from the usual termination of employment or that it was done in any way that could cause anything more than the normal upset that would result from any termination of employment … The complaint is not sufficient if it simply alleges mere termination . . . Rather, a complaint must allege more, for instance, that the actual termination was . . . done in an inconsiderate, humiliating, or embarrassing manner." (Citation omitted; internal quotation marks omitted.) *Green-Cubano v. Norwalk Acquisition I,*

*LLC,* No. FSTCV146023777S, 2015 Conn. Super. LEXIS 1636, at *16-17 (Super. Ct. June 23, 2015). The Connecticut Supreme Court in *Parsons* emphasized that wrongful termination on its own does not support a negligent infliction claim.

> [N]egligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable **conduct** of the defendant in the termination process . . . **The mere termination of employment,** ***even where it is wrongful,*** **is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress. The mere act of firing an employee,** ***even if wrongfully motivated*** **does not transgress the bounds of socially tolerable behavior.**

*Parsons v. United Technologies Corp.*, 243 Conn. 66, 88, 700 A.2d 655 (1997) (emphasis added, citations omitted, internal quotation marks omitted); *see also Pascal v. Alternative Services of Conn., Inc.*, 1998 Conn. Super. LEXIS 3481, *2 (Dec. 8, 1998, Conn.Super.) (noting that the Supreme Court's holding in *Parsons* limiting negligent infliction of emotional distress to occasions where the employer's conduct is beyond the boundaries of socially tolerable conduct is consistent with previous observations that "courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation"). "As made clear by *Parsons* and the cases it cites, it is the conduct of an employer that is subject to scrutiny when a claim is brought under this tort, not the motivation." *Peralta v. Cendant Corp.,* 123 F. Supp. 2d 65, 83 (D. Conn. 2000) (denying summary judgment on a claim of negligent infliction where the plaintiff's supervisor falsified reviews in order to cause the plaintiff's termination)

In this case, Bride Brook's conduct in processing and explaining its pre-employment requirements was nothing less than professional and courteous.  It is common practice and standard procedure for employers, including medical and nursing facilities like Bride Brook, to condition offers of employment upon successful completion of background checks and drug tests. Ms. Noffsinger was well aware of this process and understood that such contingencies may

11

be required based on her prior employment experiences and employment process with Bride Brook, which she agreed to as part of the interview and candidate screening process. *See* Defendant's 56(a)1, **Exhibit B**, at 57:54 – 56:10 ("I had to complete a background check for Touchpoints. I don't remember if I had to take a drug test or not. I had to take a drug test to work at Waterbury Hospital, and background check. That's very standard, the background checks. Drug tests aren't always necessarily standard.")  Nevertheless, from the moment that Ms. Noffsinger accepted the offer, Ms. Mailloux followed standard protocol as she would for every new potential hire.  *Id.* at ¶ 2.  Ms. Mailloux emailed Ms. Noffsinger immediately after she accepted the job offer to initiate the necessary pre-employment screenings.  *Id.* at **Exhibit D**. When Ms. Mailloux sent the July 22, 2016 email requesting Ms. Noffsinger to attend the August 3 orientation she had no idea that Ms. Noffsinger would test positive for THC and that Alere Toxicology would take a full week to report the results.  Indeed, Ms. Noffsinger did not disclose to Ms. Mailloux until Monday, July 25, 2016, that she used marijuana.  *Id.* at ¶ 13.  Ms. Noffsinger testified at her deposition:

Q: At that time, up through July 22nd, had you disclosed to Bride Brook that you used medical marijuana?

A: No, I had not.

Q: And same question up through that time, up through July 22nd, had you disclosed to anyone at Bride Brook that you were a qualifying patient?

A: No, I had not.

Q: Was July 25th, that Monday, the first time you disclosed that you were a qualified patient to Ms. Maillioux?

A: Yes. If the 25th was the second meeting, then yes, that was the second day.

Q: That was the meeting you went to do the pre-employment paperwork.

A: Then yes, that was the one I disclosed.

*Id.*, **Exhibit B***, at 74:15 – 75:9.   The process and procedure that Bride Brook must take with respect to drug testing was explained to Ms. Noffsinger, including that Alere Toxicology would analyze the sample and call Ms. Noffsinger directly with the results, and Ms. Noffsinger had no objection to this process.  *Id.* at ¶ 14.   Ms. Mailloux promptly overnighted the container and paperwork via FedEx to Alere for processing, as she would for every single candidate.  *Id.* at ¶ 15.  In fact, with each subsequent inquiry from Ms. Noffsinger concerning the results, Ms. Mailloux promptly followed up on the status and considerately responded within the hour of each such request.  *Id.,* at **Exhibits H, I, J.**  Not once did Ms. Mailloux represent to Plaintiff that her offer was secure despite her illegal use of drugs.

Furthermore, Bride Brook was fully transparent from the very beginning that it required a negative drug test before Ms. Noffsigner could be hired.  *Id.,* at ¶ 11. Ms. Mailloux explained to Plaintiff:

> I am excited you have accepted the position. I would like for you to start as soon as possible. I understand that you need to give a two week notice. I would like your first day of employment to be either August 4/5 or Aug. 8. I will ask for you to attend an orientation Aug 3rd if possible. I do have paperwork to review in addition to an offer letter. Please let me know when you are available to stop by. We will need as you know a background check and fingerprints / drug test to be initiated ASAP.

*Id.,* at **Exhibit D**.  Plaintiff attempts to twist the plain language of this email into suggesting that "Ms. Mailloux instructed the Plaintiff to give her notice to her then current employer (Touchpoints) so that she could begin working for the Defendant." Amend. Compl., at ¶ 13.  Certainly Ms. Mailloux wanted Plaintiff to begin as soon as possible, but she never instructed her to resign from her current employer prior to receiving confirmation that she successfully completed the required pre-employment screenings detailed in the email.  Plaintiff, at her own choice, submitted her resignation to her current employer, all the while knowing that the Bride

Brook offer was contingent on certain pre-employment requirements.  It would be illogical to conclude that Plaintiff's unilateral decision to resign from her then-current employer *prior to* receiving confirmation that she was a qualified candidate in any way implies that Bride Brook's conduct unreasonably imposed a risk of harm. Further, Plaintiff's allegation that Defendant rescinded the job offer while Plaintiff was attending a going away party is immaterial to her claim as Defendant had no knowledge of the party.

As the *Parson* Court affirmed, whether or not Defendant "unlawfully" rescinded the job offer to the Plaintiff because of her use of medical marijuana, is immaterial because "[t]he mere act of firing an employee, *even if wrongfully motivated* does not transgress the bounds of socially tolerable behavior." Certainly, no jury could conclude that Bride Brook's conduct in rescinding the job offer, even if done for an improper reason, was done in an inconsiderate, humiliating or embarrassing manner.  *See Green-Cubano*, 2015 Conn. Super. LEXIS 1636, at *16-17. "Only if the **manner of termination** of an at will employee **is unreasonable, outrageous or egregious** will the tort of negligent infliction of emotional distress lie in such context" *Murphy v. Lord Thompson Manor, Inc.*, 105 Conn. App. 546, 554, 938 A.2d 1269, *cert. denied*, 286 Conn. 914, 945 A.2d 976 (2008) (emphasis added).  Truly, the cause of action for negligent infliction of emotional distress in employment cases is very limited. For example, in *Dickinson v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 431 F. Supp. 2d 247, 260 (D. Conn. 2006) the plaintiff/former employee alleged that she was yelled at, interrogated and harassed in an internal investigation.  The Court granted summary judgment for the defendant, holding that such actions are insufficient to establish negligent infliction.

> [E]ven if these actions had been part of the termination process, the court does not find them to be sufficiently wrongful that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were caused, might result in

> illness or bodily harm.  While the plaintiff has presented evidence that the
> tone [Defendant] used and the statements she made to [Plaintiff] were very
> hostile and upsetting, they did not rise to the level that would support
> a negligent infliction of emotional distress claim.

If verbal assault is insufficient to support a claim for negligent infliction of emotional distress, it

would be impossible for a jury to find the Bride Brook's routine and respectful conduct posed an

unreasonable risk of causing emotional distress.  *Compare Pascal v. Alternative Servs. of*

*Connecticut, Inc.*, No. 547184, 1998 Conn. Super. 3481, at *2 (Super. Ct. Dec. 8, 1998)

(allegations that the employer "purposefully falsified reviews in order to promote less qualified

individual and cause his termination" and "plaintiff found defendant's conduct so intolerable that

he considered quitting his employment" would be sufficient to meet this standard).

Indeed, having a job offer rescinded "inevitably leaves the applicant with some ill

feelings."  *Brockman v. Windsor Bd. of Educ.*, 3:99 CV 1220 (JBA), 2001 U.S. Dist. LEXIS

23939, at *49 (D. Conn. July 23, 2001) (citing *Pavliscak v. Bridgeport Hosp.,* 48 Conn. App.

580, 598, 711 A.2d 747, *cert. denied*, 245 Conn. 911 (1998)).  However, absent allegations of

unreasonable conduct on the part of the employer in rescinding the offer, "the slighted employee

cannot, as a matter of law, recover for these feelings of indignation." *Id.* (citation omitted).

Where, as here, there are undisputed and reasonable actions which Bride Brook took in

rescinding the offer of employment, Plaintiff cannot establish a claim for negligent infliction of

emotional distress and Bride Brook should be granted judgment as a matter of law on Count

Three of the Amended Complaint.

### C.  Defendant Is Entitled to Summary Judgment on Plaintiff's Demand for Punitive Damages, Attorneys' Fees and Costs

Paragraphs 4 and 5 of the Demand for Relief in the Amended Complaint requests an

award of punitive damages, attorneys' fees and costs – relief which is not an available remedy

for the claims pending against Bride Book.  The only claims remaining before the Court are the alleged violation of Conn. Gen. Stat. § 21a-408p (Count One) and claimed negligent infliction of emotional distress (Count Three).  The Court previously dismissed Count Two of the Amended Complaint.  *See* Order Re Motion to Dismiss, Doc. No. 48, at p. 20 (dismissing Count Two).  Even in the event the Court declines to grant judgment for the Defendant on Count One and/or Count Three, neither of the remaining causes of action would allow Plaintiff to recover punitive damages or attorneys' fees and costs as a matter of law. Paragraphs 4 and 5 must be stricken and/or dismissed.

### 1. Punitive Damages Are Not Awarded In A Cause of Action For Negligent Infliction of Emotional Distress (Count Three)

Even if Plaintiff is successful on her claim for negligent infliction of emotional distress, it is well established that a Plaintiff claiming negligent infliction of emotional distress cannot recover for punitive damages.  Only a defendant found culpable for intentional infliction of emotional harm is susceptible to punitive damages, while a negligent defendant causing foreseeable emotional harm is liable only for compensatory damages.  *See Olson v. Bristol-Burlington Health Dist.*, 87 Conn. App. 1, 8 n.2 (2005) (*citing Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003)); *Deutsche Bank Nat''l Tr. Co. v. Ofili*, No. CV146022822, 2015 Conn. Super. LEXIS 1760, at *63 (Super. Ct. July 2, 2015) (striking Count combining claims of intentions and negligent infliction because only intentional conduct would avail plaintiff to punitive damages).  Here, Plaintiff has affirmatively stated she has not alleged a claim of intentional infliction of emotional distress. "…the Plaintiff only alleges <u>negligent</u> conduct causing emotional distress on a set of facts that are sufficient to establish that tort." Pl's Opposition to Motion to Dismiss (Doc. No. 27, at p. 33) (emphasis added); see also Am. Compl.

at Count Three (Dkt. No.1 at Exhibit B).  Accordingly, Plaintiff cannot recover punitive damages on Count Three.

> 2. *Plaintiff Cannot Recover Punitive Damages on Count One Because There is No Statutory Basis and The Undisputed Facts Fail To Support a Common-Law Claim for Punitive Damages*

Connecticut's Palliative Use of Marijuana Act is silent on the award of damages and it certainly does not provide for punitive damages, attorneys' fees or costs. *See* Conn. Gen. Stat. §§ 21a-408 *et seq*.  The PUMA is not ambiguous and there is no evidence suggesting that the legislature intended punitive relief, attorneys' fees or costs to be a form of relief for violation of § 21a-408p(b).  *Compare* Conn. Gen. Stat. § 46a-89(b) (punitive damages for discriminatory conduct); Conn. Gen. Stat. § 42-110g(g) (Connecticut Unfair Trade Practices Act punitive damages); Conn. Gen. Stat. 52-240b (punitive damages in product liability actions); Conn. Gen. Stat. §52-568 (treble damages for vexatious suit).

Without a statutory claim for punitive damages, Connecticut courts allow common-law punitive damages only "when the evidence shows a reckless indifference for the rights of others or an intentional or wanton violation of those rights." *Champagne v. Raybestos-Manhattan, Inc.*, 212 Conn. 509, 532 (1989) (common law strict liability action); *Markey v. Santangelo,* 195 Conn. 76, 77 (1985) (common law assault and battery action); *Vandersluis* v. *Weil*, 176 Conn. 353, 358, 407 A.2d 982 (1978).  "**As a general rule, punitive damages may be awarded only for outrageous conduct**." *Ames v. Sears, Roebuck & Co.,* 8 Conn. App. 642, 655 (1986). Importantly, Connecticut Supreme Court has held that recklessness requires a "conscious choice" with either actual or constructive knowledge of the "serious danger" involved.  *Matthiessen v. Vanech*, 266 Conn. 822, 832 (2003).  It requires a state of consciousness even greater than gross negligence, and it "tends to take on the aspect of highly unreasonable conduct, involving an

extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Id.* at 832-33.  Overall, these authorities make it clear that punitive damages are an extraordinary remedy, to be awarded only in extraordinary cases where there is "outrageous" or "evil" or "extreme" conduct.

Where the claims do not allege conduct sufficiently outrageous to warrant punitive damages, a motion for summary judgment should be granted.  For example, the Court in *GE Capital Corp. v. DirecTV, Inc.*, 94 F. Supp. 2d 190, 202 (D. Conn. 1999) granted a motion for summary judgment on a counterclaim for punitive damages where the claims (essentially breach of contractual warranty) do not allege conduct sufficiently outrageous to warrant punitive damages. "The flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." *Id*. As set forth in more detail above, the undisputed facts pertaining to Bride Brook's conduct do not rise to the level of negligent conduct, nevertheless outrageous conduct. The evidence shows that Bride Brook simply followed its standard processing procedure, just as it does with every potential employee. Bride Brook's conduct in this case indubitably was not "outrageous", "evil", or "extreme" as needed to support a punitive damages award. There are simply no facts to support a punitive damages award in this case, and the punitive damages claim should accordingly be summarily denied.

> ### 3.Plaintiff Cannot Recover Attorneys' Fees or Costs Under Either Count One or Count Three

Connecticut courts have consistently held that common-law punitive damages, if awarded, are limited to litigation expenses less taxable costs.  *See Bifolck v. Philip Morris, Inc.*, 324 Conn. 402, 432 (2016) (citing *Waterbury Petroleum Products, Inc., v. Canaan Oil & Fuel*

*Co.,* 193 Conn. 208 (1984)).  Here, Paragraphs 4 and 5 of Plaintiff's Demand for Relief are duplicative of the same relief because Paragraph 4, if awarded, would only permit Plaintiff to collect litigation expenses, including attorneys' fees and costs.  Regardless, because Plaintiff has failed to state a claim as a matter of law for common-law punitive damages, and because she has failed to identify an exception to the "American Rule" prohibiting an award of attorneys' fees and ordinary expenses absent a contractual clause or statutory authority, Paragraphs 4 and 5 of Plaintiff's Demand for Relief fails as matter of law. *See Centimark v. Vill. of Manor Assocs. Ltd. P'ship*, 113 Conn. App. 509, 539, *cert. denied*, 292 Conn. 907 (2009) (pursuant to the America Rule, attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception).  Here, there are no applicable statutory or contractual provisions that would provide for such relief.  Accordingly, summary judgment should be granted in favor of Defendant as to Paragraphs 4 and 5 of Plaintiff's Demand for Relief in the Amended Complaint.

## IV.     <u>CONCLUSION</u>

For the reasons set forth above, Defendant respectfully requests that the Court grant its Motion for Summary Judgment.

DEFENDANT, SSC NIANTIC OPERATING
COMPANY, LLC d/b/a BRIDE BROOK HEALTH
& REHABILITATION CENTER.

By: /s/ Thomas C. Blatchley_____
        Thomas C. Blatchley (Fed. Bar. # ct25896)
        Shannon M. Walsh  (Fed. Bar. #ct30219)
        Gordon & Rees Scully Mansukhani
        95 Glastonbury Boulevard, Suite 206
        Glastonbury, CT 06033

Phone: (860) 494-7525
Fax: (860) 560-0185
Email: <u>tblatchley@gordonrees.com</u>
Email: <u>swalsh@gordonrees.com</u>

## **CERTIFICATION**

I hereby certify that on this 17th day of November, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filings.  Parties may access this filing through the Court's CM/ECF System.

Plaintiff's Counsel
Henry F. Murray, Esq.
hfmurray@lapm.org
Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922

/s/ Shannon M. Walsh
Shannon M. Walsh