UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                      :
KATELIN NOFFSINGER,       :  No. 3:16CV1938(JAM)
                      :
         Plaintiff  :
                      :
        vs.           :
                      :
SSN OPERATING COMPANY LLC d/b/a :
BRIDE BROOK NURSING &      :
REHABILITATION CENTER,    :
                      :  New Haven, Connecticut
         Defendant  :  January 8, 2018
                      :
- - - - - - - - - - - - - - - - x

MOTION HEARING

B E F O R E:

    THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

A P P E A R A N C E S:

   FOR THE PLAINTIFF:

       LIVINGSTON, ADLER, PULDA, MEIKLEJOHN & KELLY
          557 Prospect Avenue
          West Hartford, Connecticut 06105
       BY:  HENRY F. MURRAY, ESQ.
          ZACHARY L. RUBIN, ESQ.

   FOR THE DEFENDANT:

       GORDON & REES LLP
          95 Glastonbury Boulevard, Suite 206
          Glastonbury, Connecticut 06033
       BY:  THOMAS C. BLATCHLEY, ESQ.

                      Diana Huntington, RDR, CRR
                      Official Court Reporter

1                          **3:08 P.M.**

2                THE COURT:  We're here today for arguments on

3      the cross motions for summary judgment in the matter of

4      Noffsinger v. SSN Niantic.

5                May I have the appearance of counsel, please,

6      for plaintiff.

7                MR. MURRAY:  Yes, Your Honor.  Henry Murray.

8      And with me is Zach Rubin who has an appearance in this

9      case and the plaintiff Katelin Noffsinger.

10               THE COURT:  Good afternoon.

11               MR. BLATCHLEY:  Good afternoon, Your Honor.  Tom

12     Blatchley for the defendant SSN Niantic Operating Company

13     doing business as Bride Brook.

14               THE COURT:  Great.  All right.

15               So obviously we have kind of dueling motions, so

16     I have to hear from one of you first.  I might start off

17     with you, Mr. Blatchley.  And then, I don't know, I know

18     we've had one argument before in this case, but you know I

19     give all sides every opportunity that they can to make the

20     points that they want to make.  There's no prejudice from

21     being the first or the last one to go.  If you'd like to

22     start off, Mr. Blatchley.

23               Come on up to the lectern.  Never mind all the

24     extra tables.  We have jury selection going on tomorrow.

25               MR. BLATCHLEY:  For your preference, do you want

1    me to first address our moving papers?

2           THE COURT:  I think your moving papers, there's

3    a lot of overlap there, especially on Count One.

4           MR. BLATCHLEY:  Yes, Your Honor.

5           Your Honor, as you well know, we moved for

6    summary judgment as to both counts.  The first count is

7    the PUMA, the palliative use of marijuana statute.  The

8    third count is the negligence infliction of emotional

9    distress count.

10          As you well know, in drafting the Palliative Use

11   of Marijuana Act, the Connecticut legislature carved out a

12   specific exemption for employers who must enforce a

13   drug-free workplace as required by federal law.  Under

14   21a-408p, the subsection at issue here which the plaintiff

15   has called an inter-discrimination provision, even though

16   there is no reference to the word "discrimination" in that

17   provision, it begins with "Unless required by federal law

18   or required to obtain federal funding, no employer may

19   refuse to hire a person solely on the basis of any such

20   person's status as" --

21          THE COURT:  Great.  So let's start off with

22   that.  So the requirement is that essentially you get an

23   out from the obligations of the PUMA statute if you were,

24   as it says, required, right --

25          MR. BLATCHLEY:  Correct.

1          THE COURT:  -- by federal law or required to

2    obtain federal funding.

3          Now, what law required you to rescind the

4    employment offer to Ms. Noffsinger?

5          MR. BLATCHLEY:  There's no law specific per se,

6    Your Honor, but we maintain under our papers that the

7    Drug-Free Workplace Act requires statements be made and to

8    require that no medical marijuana or illegal drugs.  And

9    under federal law, marijuana is still an illegal drug.

10          THE COURT:  Let me back up again.  I heard you

11   say there's no law per se that required you to rescind the

12   offer?

13          MR. BLATCHLEY:  There's no law that requires to

14   rescind a job offer, but there is a compliance requirement

15   to comply -- we maintain to require with federal law.

16          THE COURT:  Okay, great.

17          So what federal law would have been violated if

18   you had hired Ms. Noffsinger?

19          MR. BLATCHLEY:  We believe that under, for

20   example, the Controlled Substances Act --

21          THE COURT:  Don't give me examples.  Give me

22   your whole list.  I've got to know all the laws that you

23   think would have been violated or that required you here.

24          MR. BLATCHLEY:  Well, Your Honor --

25          THE COURT:  Controlled Substance Act, I already

1   dealt with that once.

2           MR. BLATCHLEY:  Right.  So the very acts that we

3   talked about in our motion for preemption a few months

4   ago.

5           THE COURT:  So we've got the Controlled

6   Substances Act.  The ADA, right?  You've got a new one

7   here that has popped up recently, right?  I don't recall

8   dealing with this or hearing about this before, the

9   drug-free workplace?

10          MR. BLATCHLEY:  Yes, Your Honor.

11          THE COURT:  Any reason why that didn't come up

12  earlier?

13          MR. BLATCHLEY:  No, it was just a matter of

14  strategy, Your Honor, and the way we worked out the legal

15  briefing and developed the facts for this.

16          THE COURT:  I see, okay.

17          And so I couldn't find anything in the drug-free

18  workplace law that said you would be violating federal law

19  if you had hired Ms. Noffsinger.  I couldn't find it.  Is

20  there some provision I might have overlooked?

21          MR. BLATCHLEY:  Can I just grab --

22          THE COURT:  Sure.

23          MR. BLATCHLEY:  Your Honor, under 8102, it talks

24  about the use of controlled substances and in published

25  restatements.  Our position is that we had a substance

1    abuse policy that required compliance with federal law and

2    that any use of medical marijuana --

3              THE COURT:  Again, what statute exactly or what

4    regulation?

5              MR. BLATCHLEY:  41 U.S.C. 8102(a)(1).

6              THE COURT:  41 U.S.C. 81 --

7              MR. BLATCHLEY:  -- 02(a)(1).

8              THE COURT:  Okay, I've got it right in front of

9    me here.  It's (a)(1)?

10             MR. BLATCHLEY:  Yes.  Subdivision (A), the

11   publishing statement.  So it requires recipients of

12   federal contracts to provide a drug-free workplace by,

13   among other things, providing a statement notifying the

14   employees that the unlawful manufacture, distribution,

15   dispensation, possession or use of a controlled substance

16   is prohibited in the person's workplace.

17             And then it goes down in subdivision (D)

18   notifying the employee in the statement required by

19   subparagraph (A) that as a condition of employment on the

20   contract the employee will abide by the terms of the

21   statement.

22             THE COURT:  Okay, hold on just a second.  I'm

23   going to take a moment to look more closely at this.

24             MR. BLATCHLEY:  Sure.

25                  (Pause.)

1          THE COURT:  Let me direct your attention to

2    (a)(1)(A), do you see where it says that?

3          MR. BLATCHLEY:  Yes.

4          THE COURT:  And do you see it says "publishing a

5    statement notifying employees that the unlawful

6    manufacture," et cetera, et cetera, "is prohibited" -- do

7    you see the next words there?

8          MR. BLATCHLEY:  Yes.

9          THE COURT:  -- "in the person's workplace."  Do

10   you see those three words there?

11         MR. BLATCHLEY:  Yes, Your Honor.

12         THE COURT:  I should say four words, I'm sorry,

13   "in the person's workplace."

14         MR. BLATCHLEY:  Right.

15         THE COURT:  Do those words mean anything here?

16         MR. BLATCHLEY:  Well, I think use of a

17   controlled substance is prohibited in the person's

18   workplace.  I think in this context in particular whether

19   they take marijuana outside the workplace, they'd still be

20   using it.  I think it would render the statute superfluous

21   to include that use wouldn't mean use within the workplace

22   and outside the workplace.  Particularly in the use of

23   medical marijuana or synthetic or whatever it may be, when

24   you take that at night, you're still under, you know,

25   under the effects of that.

1          THE COURT:  I get that argument.  I get that

2     Congress could have, if it wanted to, could have drafted

3     the statute that didn't make reference to "in the

4     workplace" or could have said that prohibits the unlawful

5     employment while under the influence or, you know,

6     something like that.  But here we have specific words that

7     say "manufacture, distribution, dispensation, possession

8     or use."  And I see five, I guess, verbs there.  And none

9     of those five verbs seem to apply on our facts here,

10    that's my concern.

11          MR. BLATCHLEY:  Okay.

12          THE COURT:  So if I'm right about that

13    interpretation, is there any other argument under the

14    Drug-Free Workplace Act?

15          MR. BLATCHLEY:  Looking down to subparagraph

16    (G), "making a good faith effort to continue to maintain a

17    drug-free workplace."  We maintain the same argument.

18          THE COURT:  But then it says, right, "through

19    implementation of subparagraphs (A) to (F)."

20          So if I recognize a limitation, basically an

21    in-the-workplace use or possession limitation on this

22    statute, it seems to me it's hard to say that sub-part (G)

23    goes more broadly.

24          MR. BLATCHLEY:  I understand.

25          And sub (D), the requirement of subparagraph (A)

1    that as a condition of employment on the contract.

2              THE COURT:  Sure.  Sub (D) is confined to the

3    scope of sub (A).  If I look at sub (A), that's my concern

4    about the Drug-Free Workplace Act argument.

5              MR. BLATCHLEY:  Yes, Your Honor.

6              THE COURT:  I take it there is no record

7    evidence here that -- Ms. Noffsinger never ended up

8    working for you, but as far as I can tell, the record

9    evidence here is that if she had worked for you, she would

10   have been working while at the same time at night taking

11   this medication that was expressly provided for under

12   PUMA.

13             MR. BLATCHLEY:  That's correct.

14             THE COURT:  All right.  So that's the argument

15   at least on drug-free workplace.  And I have to think

16   whether I adopt the broader interpretation of that.

17             Your interpretation is that that law would

18   prohibit you -- your client, I should say, from hiring

19   anybody who smokes a joint of marijuana at night.

20             MR. BLATCHLEY:  Yes, Your Honor.  I think with a

21   broad read of that statute, they'd still be using it,

22   whether inside the workplace or outside the workplace.

23             THE COURT:  All right.  Okay.  I got your

24   argument there.

25             If you have nothing else to say on the drug-free

1    workplace statute, I want to ask you about your False

2    Claims Act argument.  That's kind of the last of the

3    federal laws that you think --

4              MR. BLATCHLEY:  Correct.

5              THE COURT:  And it didn't get a lot of

6    dedication to space in your briefing.  Tell me what

7    exactly is your argument there.

8              MR. BLATCHLEY:  The argument being that

9    marijuana is still an illegal substance, Schedule I

10   substance under federal law.  Particularly, the Attorney

11   General recently coming out last week, it looks like they

12   have retracted the position from the previous

13   administration in the AG's Office that it could be

14   construed to be falsification of records to the federal

15   government if we're knowingly employing people that are

16   knowingly violating federal law, notwithstanding that

17   Connecticut statute.

18             THE COURT:  So what would be the falsification?

19   What record would you be required to falsify if you had

20   employed Ms. Noffsinger?

21             MR. BLATCHLEY:  We'd revert back to the

22   Drug-Free Workplace Act and knowing that we're employing a

23   person that is knowingly violating the law.

24             THE COURT:  Okay.  So the falsification would be

25   that you would be certifying your compliance with the

1    Drug-Free Workplace Act.

2              MR. BLATCHLEY:  Correct.  And the government

3    could make the claim that we're aiding and abetting

4    illegal behavior by virtue of knowingly employing a person

5    who is engaging under illegal activity at least under

6    federal law.

7              THE COURT:  I want to get to that argument in a

8    moment.  That's not a falsification argument.  That's not

9    a False Claims Act statute.  That's sort of like the

10   Justice Department might go after you for drug

11   trafficking, aiding abetting drug trafficking, right?

12             MR. BLATCHLEY:  Right.

13             THE COURT:  So let's get to that in a moment.

14             Just on the False Claims Act, if I don't agree

15   with your kind of broad interpretation of the drug-free

16   workplace statute, the one that we just looked at, does

17   the False Claims Act argument also fail?

18             MR. BLATCHLEY:  I don't know if it necessarily

19   fails insofar as I still think it could be construed as

20   defrauding the government if you're knowingly employing

21   somebody violating federal law.

22             THE COURT:  Okay.  So basically your argument is

23   any business that gets federal funds is defrauding the

24   government if it's employing anybody who smokes a joint of

25   marijuana at night, that's your argument?

```
 1            MR. BLATCHLEY:  Yeah, well -- no, no.
 2            THE COURT:  It's not your argument?  It sounds
 3  to me like it's your argument, I want to make sure I had
 4  it right.
 5            MR. BLATCHLEY:  I think that could be made --
 6  yeah, I think the government could come after that
 7  business.  But particularly --
 8            THE COURT:  I'm not talking about what the
 9  government could come after.  I'm talking about whether
10  the business is actually in violation of federal law by
11  hiring somebody who smoked a joint of marijuana at night.
12            MR. BLATCHLEY:  I think that argument could be
13  made under the -- if in fact they were complying with the
14  Drug-Free Workplace Act, I think that argument is a sound
15  argument.
16            THE COURT:  Okay.  So if I adopted your
17  interpretation of the drug-free workplace statute to
18  extend to prohibiting employers from hiring anybody who
19  smoked a joint at night, then that would be --
20            MR. BLATCHLEY:  Correct.
21            THE COURT:  Okay.
22            But if we took the drug-free workplace statute
23  out of the equation here, I take it it's not otherwise
24  independently a violation of federal law for a company to
25  hire a worker who smokes a joint of marijuana at night.
```

1          MR. BLATCHLEY:  For the company itself?

2          THE COURT:  For the company.  I understand it's

3   a violation for the person who is smoking a joint of

4   marijuana.

5          MR. BLATCHLEY:  Yes, Your Honor.

6          THE COURT:  But it's not a violation for the

7   company to do that, right?

8          MR. BLATCHLEY:  Right.

9          THE COURT:  All right.  Let's get to your aiding

10   and abetting theory.  As I understand it, your argument is

11   any company that hires somebody who smokes a joint of

12   marijuana at night and knows about it, I guess, is aiding

13   and abetting a federal drug-trafficking crime?

14          MR. BLATCHLEY:  Arguably, yes, they're

15   perpetuating their client if they're knowingly

16   participating or knowing --

17          THE COURT:  The company is not there.  The CEO

18   is not there lighting the match for the joint.  I'm not

19   talking about that.  Not providing the dope, okay?  I'm

20   just saying the person's working during the day while the

21   company knows that at night they're smoking a joint.  So

22   you say to continue to employ the person is aiding and

23   abetting a drug possession crime?

24          MR. BLATCHLEY:  I think in a case like this

25   where the admission has been made that certain illegal

1   substances are being used, then the company is on notice.

2           THE COURT:  Okay.

3           MR. BLATCHLEY:  And I would submit that's aiding

4   and abetting a violation of federal law.

5           THE COURT:  What if an employee says, you know,

6   I didn't pay my taxes last year.  Just, you know, I don't

7   really like to pay my taxes.  Does the company have to

8   fire that person immediately, otherwise it is aiding and

9   abetting the federal tax cheats?

10          MR. BLATCHLEY:  I think that argument could be

11  made.  Whether that happens in practice probably isn't the

12  norm and doesn't happen.

13          THE COURT:  I'm just saying, I'm trying to

14  figure out what your relational argument is.

15          What if the person says at nighttime when I go

16  home, I speed a lot, I go like 10 miles over the speed

17  limit.  Would the company, by continuing to employ that

18  person, be aiding and abetting a violation of federal

19  safety laws?

20          MR. BLATCHLEY:  Again, I think that's an

21  extreme.  We're talking about a violation of a federal law

22  of a Schedule I substance versus speeding.

23          THE COURT:  There's federal speed limits.

24          MR. BLATCHLEY:  But I believe --

25          THE COURT:  Federal tax laws.  I'm trying to

 1    understand the breadth of this argument about aiding and

 2    abetting.

 3              MR. BLATCHLEY:  No, I understand, Your Honor.  I

 4    think the same argument could be made, it's to what extent

 5    the government is going to choose to enforce those as

 6    crimes.  I don't think the government will choose to

 7    enforce a speeding violation of 10 miles per hour over the

 8    speed limit.

 9              THE COURT:  But does it matter that the

10    government is going to enforce or is not going to enforce?

11    The issue for the company, right, is, as I understood it,

12    is whether it puts the company in violation of the law.

13    There's no record evidence in our extensive summary

14    judgment record here that the Justice Department was

15    waiting to hammer SSN Niantic, right, for employing an

16    activities instructor for people who are in the last

17    stages of their lives because that person was on medical

18    marijuana, right?  You hadn't received a target letter

19    from the United States Attorney, had you?

20              MR. BLATCHLEY:  That's correct, Your Honor.

21              THE COURT:  You had no inkling, right, at the

22    time that DOJ was coming down hard on companies, old folks

23    homes who hire recreational managers who are using medical

24    marijuana for their PTSD?

25              MR. BLATCHLEY:  That's correct, Your Honor.

 1          THE COURT:  I have to look not at kind of a

 2   prediction about what the DOJ might do or what some

 3   prosecutor might do, but I have to look at whether it

 4   actually amounts to a violation of law, don't I?

 5          MR. BLATCHLEY:  Yes.

 6          THE COURT:  Okay.  So I think I have your

 7   arguments then, unless you have anything more --

 8          MR. BLATCHLEY:  No, just what's in the papers.

 9          THE COURT:  -- on the first count.

10          And at least as to the specific laws violated, I

11   had some questions about I think your argument on the

12   Marinol issue here.  I think you're arguing that -- help

13   me understand, what is the argument that you're making

14   about Marinol?  Because I'm having a hard time

15   understanding how you are prejudiced by what looks to me

16   to be basically a scrivener's error or a matter of

17   superfluous language here.  Help me understand that

18   argument.

19          MR. BLATCHLEY:  I don't know if it's a

20   scrivener's error on the plaintiff's part.  They've

21   maintained that argument throughout the duration of this

22   litigation, through the CHRO action, and through the

23   plaintiff's deposition and they've consistently used

24   Marinol.

25          Marinol is a Schedule III drug that's FDA

1    approved.  It's not regulated under the PUMA, and

2    therefore we don't believe there could be a violation

3    under the Act itself.

4              THE COURT:  So it is FDA approved?

5              MR. BLATCHLEY:  Yes, it is.

6              THE COURT:  So under your policy, your client's

7    policy, does it violate your client's policy to hire

8    people who were using Marinol?

9              MR. BLATCHLEY:  I don't believe, Your Honor.  I

10   have to confirm.  My understanding is that it's only drugs

11   that are illegal under federal law.  And we cite --

12   there's a long cite in our brief that cites to I believe

13   DC circuit case that goes through the genesis of the

14   synthetic form and how -- it basically overviews Marinol

15   and how it gets its name and how the FDA approved it.

16             THE COURT:  Here's my question.  If somebody

17   applies to work for SSN Niantic and they're using Marinol,

18   is that person even subject at all to being not hired or

19   fired?  Does it violate your company's drug-free workplace

20   law?

21             MR. BLATCHLEY:  I believe that if it's a legal

22   substance, then --

23             THE COURT:  If it is legal.

24             MR. BLATCHLEY:  Correct.

25             THE COURT:  And Marinol's legal.

```
 1              MR. BLATCHLEY:  Correct.

 2              THE COURT:  Okay.

 3              MR. BLATCHLEY:  So our argument is that the

 4    plaintiff doesn't even trigger a violation of PUMA if in

 5    fact the substance being used was Marinol, which is a

 6    Schedule III drug that's FDA approved.

 7              THE COURT:  If in fact it was Marinol.

 8              MR. BLATCHLEY:  And that's become a point of

 9    contention.  After briefing, there was affidavit saying --

10    I forgot, it was basically the plaintiff was confused or

11    didn't understand or I'm not sure where the --

12              THE COURT:  Used a misnomer.

13              So what is the evidence -- apart from the label

14    like the name Marinol, what is the evidence in this record

15    that the substance that she was actually using was Marinol

16    and was not medical marijuana within the scope of PUMA?

17              MR. BLATCHLEY:  Just her verified --

18              THE COURT:  Only her statements.

19              MR. BLATCHLEY:  Her statements under oath and

20    her verified affidavit that was submitted with the

21    Connecticut Commission on Human Rights and Opportunities

22    which is a sworn statement.

23              THE COURT:  In terms of the actual substance --

24    I know you've had depositions and done discovery, right,

25    now at this point.  What have you learned from discovery
```

1    to show that in fact she was taking Marinol and not

2    medical marijuana within the scope of PUMA?  I'm talking

3    about not what she has said, not what label she's put on

4    it, I'm talking about what's the record show in terms of

5    what the substance actually was that she was taking.

6            MR. BLATCHLEY:  There's one document that was

7    produced, I think it was attached to the plaintiff's most

8    recent affidavit, but that doesn't show that that's what

9    she actually used.  It could have been what was purchased,

10    but it doesn't show what the plaintiff actually used.  All

11    we have, my understanding at this point, is just the

12    witness testimony from the deposition and the verified

13    affidavit that she filed with the CHRO.

14            THE COURT:  Did she come in on July 25th with a

15    bottle of the actual medication that she was using and to

16    show it to -- I don't know how to pronounce it, is it Lisa

17    Mailloux?

18            MR. BLATCHLEY:  Mailloux.

19            THE COURT:  She actually showed the substance

20    that she was using to Ms. Mailloux?

21            MR. BLATCHLEY:  I think the record is unclear as

22    to what the actual vile said on it.  I think both sides

23    have said it was a vile or understand it to be a vile.  I

24    don't know if it actually had the actual whatever the

25    substance was that was in the vile itself.

1          THE COURT:  So when the company decided not to

2    hire her, it decided not to hire her I think by your

3    reckoning because the drug test came back positive?

4          MR. BLATCHLEY:  For THC.

5          THE COURT:  For THC.

6          MR. BLATCHLEY:  Correct, Your Honor.

7          THE COURT:  And was there any other reason why

8    the company did not decide to hire her?

9          MR. BLATCHLEY:  Well, she states in her

10   affidavit and throughout her pleadings that she wasn't

11   hired because of her PTSD and related -- you know, things

12   related to her PTSD.

13         THE COURT:  How about from your perspective,

14   since it's your company client, aside from what she may

15   say about why your company acted the way it did?  I'm

16   trying to find out what the record actually shows as to

17   why your company took the action that it did.

18         MR. BLATCHLEY:  The record is clear, from our

19   end, is the positive result.

20         THE COURT:  Positive result in violation of your

21   drug policy.

22         MR. BLATCHLEY:  Correct.

23         THE COURT:  Okay.  That's helpful to know.

24         So does Marinol have the THC that would have

25   triggered this?

```
1            MR. BLATCHLEY:  I believe so, Your Honor.  I'm

2   certainly not a drug expert.  I believe it does,

3   Your Honor, but I'm not sure.

4            THE COURT:  Okay.  So your argument then I guess

5   is the company refused to hire her because the drug test

6   came back saying it was THC and that would have violated

7   the company's own drug policy?

8            MR. BLATCHLEY:  Correct.

9            THE COURT:  And I guess your argument then --

10  correct me if I'm wrong about this -- would be that even

11  if she had been taking Marinol, really Marinol, not

12  something else that was within the scope of PUMA, that

13  that would have also because it has THC in it.

14           MR. BLATCHLEY:  Well, Your Honor, I don't know

15  and no expert has opined that it does have THC in it.

16  Nevertheless, Marinol is still a Schedule III FDA-approved

17  drug, it's not illegal under federal law.

18           THE COURT:  Okay.

19           Is there anything in the record that contradicts

20  plaintiff's assertion that she was using medical marijuana

21  that was in fact approved in accordance with PUMA law?

22           MR. BLATCHLEY:  Her own statements, Your Honor.

23  She testified at her deposition that she was using Marinol

24  and in the CHRO affidavit that was filed back in January

25  of last year.
```

1           THE COURT:  Okay.  Apart from her own sort of

2   characterizations of it, there's no -- nothing in the

3   record other than what her characterizations are of the

4   substance that she was taking?

5           MR. BLATCHLEY:  Of what she actually used?

6           THE COURT:  Yes.

7           MR. BLATCHLEY:  No, the only thing that remotely

8   touches on that possibly is I guess what she purchased

9   from the dispensary attached to the most recent affidavit.

10  But that doesn't show what she was actually using, it just

11  shows purchase.  And even then I'm not familiar, I Googled

12  some of those drugs and it was very difficult to discern

13  what the actual drug was that's referenced.

14          THE COURT:  Okay.  So let me just get back to

15  this point that you're making about the CHRO filing.  In

16  the CHRO filing, the claim there by plaintiff is that she

17  was not hired because of her PTSD?

18          MR. BLATCHLEY:  Correct, for which she treats.

19          THE COURT:  I'm sorry?

20          MR. BLATCHLEY:  Yes.

21          THE COURT:  Is your argument that that amounts

22  to essentially some kind of an estoppel?

23          MR. BLATCHLEY:  Well, I think it certainly

24  creates an issue of fact for the jury to consider if she's

25  on the one hand filing an action in this court.  Know that

1   there isn't a separate violation, you don't go to -- for

2   example, using this plaintiff's case, for example, you

3   don't go to the CHRO, there's no specific statute that

4   governs medical marijuana violation of the PUMA.  So those

5   plaintiffs just simply go to court.

6          So here she's almost contemporaneously filing an

7   action in this Court claiming that we didn't hire her

8   because of the medical marijuana, the PUMA.  And then on

9   the other hand she's going to the CHRO telling them the

10  same story saying Bride Brook didn't hire me because I

11  suffered from PTSD for which I use medical marijuana.

12          THE COURT:  Aren't they kind of the same?

13          MR. BLATCHLEY:  Well, I think it's for the jury

14  to determine.

15          THE COURT:  As you told me before, you can't go

16  to the CHRO and seek relief on grounds that you're using

17  medical marijuana approved under Connecticut law, right?

18  But I think, at least as I understand your claim, is the

19  whole reason why she's been prescribed medical marijuana

20  is her PTSD which itself is presumably a recognized

21  disability that could be grounds for relief under the

22  CHRO, right?

23          MR. BLATCHLEY:  Right.  But the statute, the

24  PUMA statute, says solely.  And that's key.  Because that

25  means one.  Here she's going to the CHRO claiming we

1    didn't hire her because of --

2              THE COURT:  I got your argument there.

3              So you're kind of saying -- there's two ways you

4    could spin your argument, it seems to me.  One way is to

5    say, well, the fact that she's going in and saying that we

6    fired her because of her PTSD, why, that's substantive

7    evidence that that's the reason we fired her.  Now, the

8    concern I have about the argument would be every other

9    record and e-mail and everything else in this record seems

10   to say you fired her because of the drug test, not because

11   of PTSD.  So if I were kind of just weighing the evidence

12   to the extent that I'm even allowed to, or to the extent I

13   am allowed to in the summary judgment context, I might

14   have a hard time saying, well, solely because she's made

15   this inconsistent statement, that's enough to create a

16   genuine issue of fact in the face of essentially all of

17   the objective evidence at the time, including your

18   client's multiple e-mails and other communications that go

19   on at the time about why the company took the action it

20   did.  So I think that's one way of framing your argument

21   is is there a genuine issue of fact on that.

22             I think the second argument is to say, well,

23   it's essentially an estoppel, and there's something

24   troubling or bothersome about the notion that plaintiff is

25   saying the sky is blue in Courtroom A and the sky is green

1    in Courtroom B.  Do you see the difference?

2              MR. BLATCHLEY:  Yes, I agree with Your Honor.

3              THE COURT:  So I'm trying to figure out how to

4    understand your argument here.

5              MR. BLATCHLEY:  Well, I think comparing A to B

6    and the bases for denying, I certainly think I understand

7    your position or what you've stated, but I certainly think

8    that's an issue for the jury to determine that.

9              The estoppel argument, you know, throughout

10   litigating both cases, it seems fundamentally unfair to

11   have to litigate in two fora and have the plaintiff

12   complain basically contrary positions.

13             THE COURT:  I see the concern.

14             MR. BLATCHLEY:  Pardon?

15             THE COURT:  I see the concern you have.  Okay.

16             So are there other points you want to make about

17   Count One?

18             MR. BLATCHLEY:  Pardon me?

19             THE COURT:  Are there other points you want to

20   make about Count One?  We could talk a bit about the

21   punitives issue.  I know you're seeking summary judgment

22   saying there's no punitive damages allowed.  I think, as I

23   understand plaintiff, plaintiff would say, well, certainly

24   as to Count Three, the negligent infliction of emotional

25   distress, negligence doesn't warrant under any standard a

1  grant of punitive damages.  I think plaintiff says there

2  may be a grant of punitive damages possible for a

3  violation of Count One.  Help me -- what's your take on

4  that?

5          MR. BLATCHLEY:  Again, the statute itself is

6  absolutely silent, the PUMA statute is silent on any

7  punitive damages awards that could be awarded.  And the

8  legislature could have crafted that into a statute itself.

9  If you look at 46a-89(b) which is an employment statute

10  for employment discrimination, it doesn't specifically

11  provide for punitive damages.  But then other statutes as

12  well, CUTPA, 42-110g, the Products Liability Act under

13  52-240b, and 52-568 provides treble damages, for example,

14  for vexatious lawsuits.  But the legislature didn't craft

15  any punitive damages component into the PUMA itself.

16          THE COURT:  Didn't actually craft a cause of

17  action in the first place, did it?

18          MR. BLATCHLEY:  No, it did not.

19          THE COURT:  I mean, I've got to find an implied

20  one here.

21          So are you saying there's a contrast between

22  that statute, a statute that doesn't even have an express

23  cause of action, and other statutes in which the

24  legislature has expressly authorized punitive damages?

25          MR. BLATCHLEY:  Well, I think the fact that it's

1   omitted that from the statute itself is what the

2   legislature spoke on in terms of relief that could be

3   provided.

4          THE COURT:  I get your argument there.

5          Anything else on Count One?

6          MR. BLATCHLEY:  The standard for common law

7   punitive is reckless indifference.  The plaintiff argues

8   that Bride Brook acted with reckless indifference for her

9   rights.  I think the record speaks for itself.  The

10  company acted legitimately, professionally courteous.  It

11  never attempted to mislead or deceive the plaintiff.

12  Throughout the process, hiring process, they made it clear

13  that it was going to be conditioned on preemployment

14  requirements, including the drug testing.  And that was

15  made from the get-go and throughout the process.

16         THE COURT:  What was the earliest point in which

17  she was advised?

18         MR. BLATCHLEY:  I believe it was the 20th or

19  21st, if not the 25th.  I'll check my notes, Your Honor.

20         THE COURT:  That could be important, you know.

21  As I recall -- I may be corrected -- I thought it was the

22  25th when she was told, by the way, there's a drug test.

23  In fact, it was after, I think -- was it after she had

24  been told by --

25         MR. BLATCHLEY:  No, Your Honor.  In our

1    statement of facts at Paragraph 5 on or about July 18,

2    during the interview Ms. Mailloux reviewed

3    Ms. Noffsinger's resume and her experience and also

4    discussed the requirements for the position as well as

5    Bride Brook's preemployment requirements.

6              THE COURT:  So July 18 is when she's told first

7    time --

8              MR. BLATCHLEY:  Correct.

9              THE COURT:  -- that there's going to be these

10   clearance and background checks and a drug test as well?

11             MR. BLATCHLEY:  Yes.

12             THE COURT:  Okay.

13             MR. BLATCHLEY:  It was background check,

14   fingerprinting, drug screening.

15             And so that carried on.  And the plaintiff

16   herself then unilaterally decided, knowing and being

17   reminded of these requirements, I don't think we should be

18   burdened with a plaintiff -- it would be like any other

19   job.  If you know that you have to go through the process,

20   you don't tender your resignation until you're fully in

21   the door.  I think most people don't tender their

22   resignation until they've satisfied all the requirements.

23   When it's conditioned on something, maybe it would have

24   been fingerprinting or something else.  That gives rise to

25   why should we shoulder those damages because she quit and

1    how that goes to intentional infliction of -- or negligent

2    infliction of emotional distress.

3           THE COURT:  Did the company do anything to

4    encourage her to serve her two weeks' notice at her prior

5    employer to get that two-week notice in so that she could

6    start right away?

7           MR. BLATCHLEY:  I think they -- I believe the

8    record does provide that she could provide the two weeks

9    to her company.  She was repeatedly reminded that there

10   was a requirement that the job wasn't -- and we're all

11   adults here in the employment world.  And I submit that

12   most people objectively don't tender their resignation

13   with their current employer until conflicts or other

14   things pass.  It would be like an attorney, for example --

15   and I know this happened to a friend of mine, she received

16   an offer, it was conditioned --

17          THE COURT:  I get that.  Some people wait.

18   Okay.

19          MR. BLATCHLEY:  So we filed the same rules and

20   regulations that applies to all the candidates.  We didn't

21   treat her unfairly.  And so I don't think -- and this kind

22   of dovetails into the negligent infliction of emotional

23   stress argument.  I don't -- I submit objectively that we

24   treated her just like any other candidate and that we

25   didn't do anything I think in the eyes of Your Honor and a

1    juror, and I don't think it's a question for the jury,

2    because I think the facts speak a very clear picture that

3    we didn't do anything wrong -- or excuse me, looking at

4    the conduct, and I know that the plaintiff zeros in on the

5    time that it took.  They zero in on this, I guess, when

6    they took the urine sample on the 25th.  And we filed a

7    federal regulations DOT in terms of when the medical

8    review officer can provide it.  We don't actually provide

9    the notice.  It gets submitted to a third party, they

10   provide notice.  So the plaintiff is harping on the

11   notice, the seven or eight days.  The reality is it was a

12   preliminary determination.  We're not making any hiring

13   decisions, just like I think every employer out there that

14   tests for drugs or anything like that, they don't make a

15   decision based on a preliminary determination.  It has to

16   be verified by a third party.  In this case it was a third

17   party, Alere, and they conducted the testing.  We

18   helped -- the plaintiff would contact us, we'd contact

19   her.  We were working diligently to see what the results

20   would be.  I think the plaintiff herself might have known

21   what they might be.  And they may submit that, you know,

22   we should have known.  Well, should have known on

23   preliminary results is not the same as the actual verified

24   results.  And we didn't know until September 2.

25              THE COURT:  Why bother with the drug test?

```
 1              MR. BLATCHLEY:  I'm sorry?

 2              THE COURT:  Why bother with the drug test for

 3    her?

 4              MR. BLATCHLEY:  To verify -- again, it goes to

 5    the same argument that the plaintiff would make about the

 6    initial testing.

 7              THE COURT:  I guess my question was, I thought

 8    your company was dedicated to zero tolerance for drugs.

 9              MR. BLATCHLEY:  Correct.

10              THE COURT:  Then she came into your office on

11    the 25th of July, she told her point of contact there that

12    she uses marijuana.  What's to bother?  Why bother with

13    the drug test?

14              MR. BLATCHLEY:  I don't think it was clear as to

15    how often she used it at the time.  Nobody knows that

16    except for --

17              THE COURT:  Well, she told them that she's using

18    it according to a medically authorized plan, right?  She's

19    got PTSD, she's using it to treat that.  Why is everything

20    hinging on a drug test?  Basically the person has admitted

21    they're using drugs.

22              MR. BLATCHLEY:  I think they wanted to go

23    through the process and treat her fairly just like

24    everybody else.  I have prescriptions that I've been given

25    that I stopped taking, for example.  I don't think it's
```

1    reasonable to conclude that she was taking the medical

2    marijuana or Marinol at the time that she definitely would

3    have triggered a test at that time.

4                THE COURT:  Okay.

5                MR. BLATCHLEY:  We cited, Your Honor, the

6    *Parsons* case and *Peralta*.  That relates to the mere act of

7    firing an employee if wrongly motivated doesn't transgress

8    the bounds of socially tolerable behavior.  Again, here I

9    don't think that the company was willful, malicious, did

10   anything to malign the plaintiff.  I think the company at

11   the time desired to hire the plaintiff and had the policy

12   and protocols in place that weren't satisfied.  I don't

13   think that the allegations -- I think that they don't go

14   to a jury for the negligent infliction of emotional

15   distress in terms of the timing or the conduct that

16   occurred.

17               THE COURT:  Okay.

18               MR. BLATCHLEY:  Everything was done according to

19   the company's protocol and she was treated just like any

20   other employee applying for a job at Bride Brook.

21               THE COURT:  Thank you.

22               MR. BLATCHLEY:  Thank you, Your Honor.

23               THE COURT:  Mr. Murray.

24               If I could ask you, Mr. Murray, to kind of

25   follow the order that we covered with Mr. Blatchley, if we

1    can, it would help me.

2              MR. MURRAY:  Would you like me to respond to --

3              THE COURT:  Let's look at Count One.  You're

4    obviously saying there's no genuine issue of fact.  The

5    questions I had in my mind about this whole Marinol

6    issue --

7              MR. MURRAY:  Can I address that, Your Honor?

8              THE COURT:  If you would.

9              MR. MURRAY:  I think the latest affidavit

10   submitted in our reply brief made very clear that the

11   reason that the plaintiff told counsel, me, that she took

12   Marinol was because the person from Alere told her that.

13   However, if Your Honor takes a look at both in the

14   56(a)(1) statement that we've submitted, if you take a

15   look at Exhibit G which is the initial test results on

16   July 25 --

17             THE COURT:  Hold on just a second.  This is your

18   56(a)1 --

19             MR. MURRAY:  Our 56(a)1.

20             THE COURT:  So your own motion.

21             MR. MURRAY:  Our own motion, yes, Your Honor.

22             At the top, Your Honor, it says "This document."

23             THE COURT:  All right.

24             MR. MURRAY:  As you'll see, it clearly indicates

25   signed by Ms. Mailloux and also the plaintiff that the

1    initial test was positive for marijuana/THC.

2            If you go to Exhibit J, which is the test result

3    from the medical review officer from Alere, it clearly

4    indicates positive for THC.

5            The plaintiff also submitted in that --

6            THE COURT:  Does Marinol have THC?

7            MR. MURRAY:  I have no idea, Your Honor.  The

8    plaintiff submitted her list of -- I don't want to call

9    them prescriptions, because they're not really

10   prescriptions, but the medical marijuana that she acquired

11   from Prime Wellness, submitted with that affidavit

12   essentially 18 months of history indicating that on both

13   June 29th and July 19th of 2016, so roughly the period of

14   time covered in the time frame here, she filled Indicol D2

15   capsules which were made by -- which were filled by Prime

16   Wellness.  And this was, in fact, the empty vile of

17   medication that she brought with her on the 25th of July

18   when she had the conversation disclosing that she was a

19   medical marijuana user.

20           So Your Honor characterizes it as a scrivener's

21   error.  We don't know what it is, but that's clearly the

22   reason the plaintiff --

23           THE COURT:  It's a misnomer, essentially, right?

24           MR. MURRAY:  Could be a misnomer.

25           We don't think there is any genuine issue of

1  material fact of essentially the two most important things

2  on Count One that the plaintiff is a qualifying patient

3  under the statute; she has a debilitating condition, her

4  medical records were reviewed by a physician who thought

5  possibly marijuana therapy might help to ameliorate and

6  mitigate her symptoms; she registered with the Department

7  of Consumer Protection; she was issued a registration

8  card; she selected a dispensary, Prime Wellness; and since

9  November of 2016 has been getting medical marijuana to

10  help with the symptoms of PTSD.

11        I also think there is no question at all if one

12  takes a look at the evidence in this case, all of the

13  sworn statements by Ms. Mailloux and others and the series

14  of e-mails between herself, the compliance officer, and

15  the head of HR, that the sole reason that the plaintiff

16  had the offer rescinded was because of positive marijuana

17  test on the 25th and the subsequent confirmation of that

18  from Alere.

19        And I think there's also evidence in the

20  record -- and the plaintiff has testified to this -- that

21  she smoked marijuana before she started using medical

22  marijuana, this was in her deposition, smoked it once in

23  her life when she was a senior in high school.

24        Therefore, I think the logical conclusion,

25  Your Honor, is she only tested positive for medical

1    marijuana because she using medical marijuana because

2    she's a qualifying patient.  The defendant withdrew the

3    job offer, and the statute is quite clear you can't refuse

4    to hire someone because they're a qualified patient.

5           The defendant tries to invent out of whole cloth

6    an issue, a genuine issue of material fact because of an

7    alternative pleading in a separate administrative

8    proceeding that the defendant made.

9           Quite frankly, and I think we were very clear

10   about this in our papers, let me first -- what's at issue

11   here is not the plaintiff's state of mind, it's the

12   defendant's state of mind when it made its decision.  And

13   I think the evidence in this case is very clear that the

14   defendant's state of mind when it made its decision was

15   because it rescinded the job offer because the plaintiff

16   was a qualified patient who was --

17          THE COURT:  I get that point.  You heard me make

18   that point to opposing counsel.  But I'd like to

19   understand why it is you're in the CHRO saying she was

20   fired because of her PTSD.

21          MR. MURRAY:  Your Honor, in some respects it was

22   litigation strategy.  One of the things that we wanted to

23   find out was what was the defendant going to say in

24   response to the allegations at CHRO.

25          And if you take a look at Ms. Mailloux's

1   affidavit submitted in response to the answer at CHRO,

2   quite clearly the defendant says we withdrew the offer

3   of -- the job offer for activity manager because she

4   tested positive for marijuana, not because of her PTSD.

5   In some respects, Your Honor, we could have asked for that

6   admission in a request to admit.

7           THE COURT:  So the litigation strategy was file

8   a false claim with the CHRO?

9           MR. MURRAY:  Well, it's not a false claim,

10  Your Honor, because she did disclose that she did have

11  PTSD.  She disclosed the horrific circumstances to

12  Ms. Mailloux why she has PTSD because of the automobile

13  accident and the night terrors --

14          THE COURT:  I don't doubt for a moment she has

15  PTSD.  But the claim that you made to the CHRO, as you

16  say, for litigation strategy was a claim that she was

17  fired --

18          MR. MURRAY:  Well, she was not hired.

19          THE COURT:  Not hired, I should say, for a

20  reason, it sounds to me like, in laying your trap, you

21  were basically making a false statement to the CHRO.

22          MR. MURRAY:  I don't see it that way,

23  Your Honor.  You have to realize at the time that that

24  claim was made, and we had absolutely no -- there wasn't

25  even a response to the complaint.  In fact, the response

1    to the complaint didn't come until after this Court issued

2    its decision on the motion to dismiss.  We filed that

3    claim with CHRO in December of 2016.  The responsive

4    pleading, which was a motion to dismiss, was filed with

5    this Court in January.  So there was no -- we didn't know

6    what the defendant was going to claim in this particular

7    litigation.  And in fact, it wasn't until we got to

8    discovery responses in the spring and the summer of this

9    year that we knew what the defendant's response was.  I

10   guess we take exception with the Court's characterization

11   that it was a false claim.

12              We were looking for what is the defendant going

13   to claim is the reason the plaintiff wasn't hired.  And

14   certainly filing the CHRO claim in order to preserve that

15   claim, because it was pretty close to the 180 days, and in

16   order to preserve that, because we weren't going to file

17   that in this Court, we weren't going to file essentially a

18   failure to accommodate in this Court, it's not part of

19   this litigation.

20              THE COURT:  All right.  I understand that

21   argument.  Okay.

22              MR. MURRAY:  Let me find my notes here,

23   Your Honor.

24              I guess to summarize, we think that there are no

25   issues of material fact in terms of Count One.  And that's

1    the reason why the Court --

2             THE COURT:  So you would like me to grant

3    summary judgment on Count One and essentially there would

4    be a trial on damages.

5             MR. MURRAY:  That's correct, Your Honor.

6             THE COURT:  What are the damages in this case?

7             MR. MURRAY:  Well, the damages in this case,

8    Your Honor, I think are --

9             THE COURT:  Have you quantified them?

10            MR. MURRAY:  Well, she was out -- I'm not sure

11   right up here I can quantify, but she was out an entire

12   almost at this point in time I guess it would be 18 months

13   that she would have had that job.  So I think the damages

14   at least on that economic part, this was a job that was

15   going to pay between $60,000 and $70,000 a year.  The

16   plaintiff ended up taking a job that paid her much, much

17   less.  I can represent to the Court that I believe she now

18   will start a job on Monday which would have been the

19   equivalent to the job that she would have had at

20   Bride Brook.  I don't know yet from the plaintiff, I

21   haven't asked her what the difference in pay is.  In some

22   respects we're looking at economic damages of probably an

23   18-month period of time.

24            Arguably also, depending on how the Court views

25   the claim for negligent infliction of emotional distress,

1    there's arguably also compensatory damage claims in terms

2    of emotional distress.  We're not suggesting that she

3    could get emotional distress damages under Count One and

4    also get negligent infliction of emotional distress

5    damages under Count Three.

6              THE COURT:  Okay.  So have you quantified the

7    damages at this point or not?  Do you have a number?

8              MR. MURRAY:  Your Honor, I think --

9              THE COURT:  If you haven't, that's fine.

10             MR. MURRAY:  I don't think we have a number.  I

11   don't think we're talking about large amounts of money

12   here.  But for an ordinary working person like the

13   plaintiff, it was significant.

14             THE COURT:  Sure, I understand that.

15             MR. MURRAY:  It's not millions of dollars,

16   Your Honor.

17             Your Honor, I just wanted to come back a little

18   bit to the defendant's arguments in terms of --

19   essentially in terms of Count One, they essentially make

20   two arguments, one of which is the legal argument that we

21   somehow can have the safe harbor, that the proviso within

22   PUMA which says if you're required under federal law or to

23   get federal grants.  And then they also have, which we

24   believe was manufactured, that there are genuine issues of

25   material fact.  If one looks at all of the -- all of the

```
 1   defendant's papers, there's not one, not one scintilla of

 2   evidence in which there's anything in which they have to

 3   certify.  In some respect, Mr. Blatchley was making like a

 4   SOX argument that they have to certify compliance with

 5   various federal laws, for example, the Drug-Free Workplace

 6   Act or certify compliance with some of the other

 7   particular, Controlled Substances Act.  I think we argue

 8   in the motion to dismiss as long as the defendant isn't

 9   manufacturing, distributing or --

10            THE COURT:  I think I understand the argument.

11            MR. MURRAY:  And I think in terms if one looks

12   at all of the subsections of the Drug-Free Workplace Act,

13   I agree with the point you made here and I think it's in

14   our papers, it's all about the illicit use of drugs in the

15   workplace.  It's not about the use --

16            THE COURT:  I get that argument.

17            MR. MURRAY:  And then finally, I think the

18   argument which I think is meritless is that as a

19   third-party grantee for Medicare and Medicaid, that they

20   have to comply with various federal laws.  If one looks at

21   the documents which were submitted in Ms. Mailloux's

22   affidavit on that particular issue with the defendants,

23   you'll see there's all sorts of things they have to do,

24   not one of those things is refuse to hire someone who

25   participates in Connecticut medical marijuana.  So I think
```

1    the legal argument about the safe harbor I think is

2    completely meritless.

3         Does Your Honor want me to address anything

4    more?

5         THE COURT:  I think that's it on Count One.  It

6    will be helpful to go to Count Three.

7         And you would agree -- I want to make sure I

8    understand, you agree that simply firing someone doesn't

9    give rise to that.

10        MR. MURRAY:  And we've never argued that,

11   Your Honor.  I know the defendants have claimed that.

12   We've never argued it.

13        THE COURT:  Your argument is it's the way that

14   they strung her along.

15        MR. MURRAY:  Essentially.  It was the conduct

16   over that period of time.

17        Just to come back, maybe because I'm

18   unfortunately too familiar with the facts in this case, if

19   you actually take a look at the original e-mail on the

20   26th of July between Ms. Mailloux and Terry Taylor, the

21   regional HR rep, Ms. Mailloux raises for the first time

22   this candidate tested positive and this was a candidate

23   she was thrilled about three days earlier, what do we do

24   about this, maybe we should tell her.  Yet between the

25   25th of July and the 3rd of August, they do absolutely

1    nothing.

2           And if you take a look also at the e-mail

3    exchange when Ms. Mailloux originally raises I think its

4    the 20th of July various e-mails with the plaintiff about

5    giving two weeks' notice, the plaintiff says I don't know

6    if I can make it in time for the August 3rd orientation,

7    because then my last day with two weeks' notice would be

8    August 4.  She then follows it up and says, well, I've

9    worked it out with my employer, I'm going to be able to

10   leave on August 2.

11          THE COURT:  When did she give her two weeks'

12   notice?

13          MR. MURRAY:  By the evidence in the record, I

14   think it would be around the 20th, 21st of July.  She

15   doesn't say exactly when, but the e-mail exchange would

16   indicate that --

17          THE COURT:  Say it's the 20th or 21st of July.

18   At that point in time the positive drug test had not come

19   back?

20          MR. MURRAY:  That's correct, Your Honor.

21          THE COURT:  But at that point in time she had

22   been told that she would be subject to a drug test; is

23   that correct?

24          MR. MURRAY:  Yes.  The e-mail exchange between

25   Ms. Mailloux and her around the 20th --

1              THE COURT:  There would be a background review

2    and also a drug test?

3              MR. MURRAY:  Right.

4              THE COURT:  So at the time that she basically

5    burned her bridges, right, with the two weeks' notice to

6    her current employer, she knew that she would have this

7    background check and the drug test, right?

8              MR. MURRAY:  That's true, Your Honor.  But she

9    also had disclosed -- and this was part of her deposition

10   testimony -- with her current employer that she was a

11   medical marijuana user.  They had no problem with that.

12   The plaintiff had no reason to know that using a substance

13   which was lawful under Connecticut law and which provides

14   employment protections would cause a problem with this

15   particular employer.

16             THE COURT:  Did she tell the employer at any

17   time prior to July 25 --

18             MR. MURRAY:  That's the first time --

19             THE COURT:  Let me finish the question.

20             MR. MURRAY:  I'm sorry, Your Honor.

21             THE COURT:  Answer as long as you'd like.

22             Did she tell the employer before July 25 that

23   she was a medical marijuana user?

24             MR. MURRAY:  She did not disclose that at that

25   time, Your Honor.  She met with the employer on the 18th

1    for the interview.  She accepted the job on the 19th.

2    They had an e-mail exchange about the drug testing and

3    background check.  It was only when she actually showed up

4    to take the drug test that she disclosed that she's a

5    medical marijuana user.

6              THE COURT:  So your argument here isn't that

7    somehow the employer was unreasonable or, as a cause of

8    action requires, essentially created an unreasonable risk

9    of causing emotional distress.  That didn't happen -- it's

10   not like we have a situation where the employer knowing

11   full well that it wasn't going to hire her told her to

12   burn her bridges and give her two weeks' notice.

13             MR. MURRAY:  That's correct, Your Honor.  I

14   would have to agree with that.

15             THE COURT:  So your argument really hinges on

16   this idea that when the employer gets that first test

17   result back, the 26th.

18             MR. MURRAY:  On the date of the 25th.

19             THE COURT:  25th or 26th.  At that point in time

20   the employer waits several more days until the 1st or 2nd

21   before telling her.

22             MR. MURRAY:  The 2nd of August.

23             THE COURT:  In the interim, the employer is

24   actually confirming the positive drug test, right?

25             MR. MURRAY:  Is confirming the positive drug

1    test.

2         But the exchange in correspondence with the

3    compliance officer and HR clearly indicates that because

4    she had failed -- because the initial test showed that she

5    tested positive for marijuana, she disclosed that she used

6    marijuana, they were never going to hire her because it

7    would have been a violation of their --

8         THE COURT:  Why did they do a confirmation test?

9         MR. MURRAY:  Your Honor, I don't know why they

10   did a confirmation test.

11        THE COURT:  You know why.  They do that because

12   they're going to try to look at -- employers make sure the

13   test is right and there hasn't been some odd thing that

14   happened, right?

15        MR. MURRAY:  I guess so.  But there was never a

16   second test as required under the Connecticut drug testing

17   policy.

18        THE COURT:  Basically common sense reason,

19   right?  An employer doesn't act unreasonably if they have

20   a drug testing protocol and they do a confirmation or a

21   re-testing of the sample, do they?  That's not

22   unreasonable.

23        MR. MURRAY:  It's not unreasonable to

24   re-confirm.  Our argument, Your Honor, is it's

25   unreasonable not to have disclosed to Ms. Noffsinger that

1  based on you being a medical marijuana patient testing

2  positive for marijuana --

3         THE COURT:  Let's say I buy that.  So what?

4  She's already burned her bridges.  She served her two

5  weeks' notice.  She did it when she knew that she was

6  going to be subject to a drug test by the employer.  She

7  didn't avail herself of the opportunity to ask the

8  employer what its position was going to be with respect to

9  her use of medical marijuana.  I'm having a hard time.

10  What difference does it make that they told her on

11  August 2 and not July 25?

12         MR. MURRAY:  There's a possibility, Your Honor,

13  that between the time when she gave her two weeks' notice,

14  and let's assume it's the 20th or 21st, and the 25th that

15  she still could have gone back and recovered her job --

16         THE COURT:  Where is that possibility in our

17  record?  You're speculating, but we're at summary

18  judgment, right?

19         MR. MURRAY:  I can't recall exactly.

20         THE COURT:  See the problem here?  The problem

21  basically is I'm trying to figure out where's the genuine

22  issue of fact, not the speculative possibility here that

23  she could have gone back at that point in time.  My

24  problem here is it looks like she burned her bridges at a

25  time when she kind of knew, would have known that this

1    would be an issue, and then the employer certainly told

2    her early that it was going to have a drug test.  It's too

3    bad that the employer wasn't as flexible as the last

4    employer, but I'm having a hard time understanding how

5    anything here amounts to what's required, which is that

6    the employer created an unreasonable risk essentially just

7    by following the standard employment procedures.  I'm

8    having a hard time with that argument.  I'm not sure that

9    there's much there.

10           MR. MURRAY:  Well, I guess, Your Honor, we would

11   say that we think that that's -- the reasonableness or

12   unreasonableness of their conduct --

13           THE COURT:  I can't imagine -- what is going to

14   be your argument?  How are you going to stand up to a jury

15   and say, you know, if she had been told four or five days

16   earlier, it would have made a difference in this case.  I

17   can't see what argument you're going to make how it caused

18   your client a whit of more harm to not know a few days

19   earlier than she otherwise was told.

20           MR. MURRAY:  Well, Your Honor, I understand that

21   maybe in the record that you currently have that was not a

22   question that was asked at her deposition by

23   Mr. Blatchley.  It is possible that --

24           THE COURT:  Well, you're the one that's got the

25   burden on the negligent infliction.  So it's not

1    Mr. Blatchley's job to come up with clever questions about

2    that.

3              MR. MURRAY:  As we said in our brief,

4    Your Honor, one of the reasons we think this goes to the

5    jury is that that's what Rule 50 was made for.

6              THE COURT:  That's actually not the way it

7    works.  I don't send cases to the jury so that we can see

8    if you can find something at that point in time.  I have

9    to find a genuine issue of fact now on the current record.

10   That's what summary judgment review is about.  All right.

11             MR. MURRAY:  Is there anything else?

12             THE COURT:  Punitives, I want to talk about

13   punitives.

14             I take it you agree that punitive damages you

15   would be seeking solely on Count One, right?

16             MR. MURRAY:  Oh, that's true, absolutely.

17             THE COURT:  Even if negligent infliction claims

18   would survive, you could only look for punitives on

19   Count One.

20             MR. MURRAY:  Right.

21             THE COURT:  So help me understand how that works

22   here.  Because I'm not -- I guess I'm not clear about what

23   my authority would be to enter or to allow for an award of

24   punitive damages here.

25             Now hear me out for a moment.  I understand what

```
1     the general common law standard is, you have to show
2     recklessness.  You're going to make your argument there
3     was recklessness here.  But I don't have a common law
4     claim here.  Count One is not a common law claim.  As I
5     understand it and the way I understood the Count One is
6     it's a statutory claim, right?  It is, right?
7               MR. MURRAY:  Yes.
8               THE COURT:  So I found that the legislature
9     intended cause of action here, didn't I?
10              MR. MURRAY:  You did, Your Honor.
11              THE COURT:  At your urging.
12              What I don't have evidence of, it seems to me,
13    is any legislative intent to create a punitive damages
14    remedy.
15              MR. MURRAY:  Well, Your Honor, the same way
16    there wasn't any evidence that the legislature either
17    intended to create a cause of action or not.  Hitting the
18    *Napolitano* standards, this Court agreed that the only
19    possible remedy for a violation of this was there would be
20    a common cause of action.
21              THE COURT:  Okay.
22              MR. MURRAY:  It seems to me what one
23    analogizes -- I understand that a *Sheets* claim is a common
24    law public policy discharge claim.  And under a *Sheets*
25    claim, for example, punitive damages are there for the
```

1 same theory that all Connecticut courts have articulated

2 for punitive damages.

3          THE COURT:  That's a common law cause of action.

4          MR. MURRAY:  I understand.

5          It seems to me that in this context in which

6 you're authorizing a cause of action to remedy a

7 particular violation, I think the Court does have

8 discretion to view it in much the same way as all

9 employment discrimination -- I understand that by statute

10 employment discrimination says you're entitled to

11 attorneys' fees. *Sheets* claim has common law punitive

12 damages claim that says the reason you're entitled to

13 punitive damages is for the same reason you're entitled to

14 attorneys' fees under these very statutory claims is so

15 the plaintiff basically gets full compensation and doesn't

16 have to share essentially whatever the jury --

17          THE COURT:  I understand the reasons why you

18 would like that.  I'm trying to figure out what my

19 authority is.

20          Are there any other examples in which a court

21 has found an implied cause of action based on a statute

22 and then also found that there is a punitive damages award

23 that's possible in addition to the implied cause of action

24 or an award of attorneys' fees in addition to the implied

25 cause of action?

1          MR. MURRAY:  I'm not aware of that, Your Honor.

2    The last court which -- in fact it was a case that our

3    firm had -- was finding an implied cause of action.  This

4    was in Superior Court in Waterbury, implied cause of

5    action under the bed fund statute.  There's a bed fund

6    statute which says that essentially medical trust,

7    hospitals are supposed to put certain money aside to pay

8    for indigent care.  This was a particular lawsuit against

9    Yale-New Haven Hospital not complying with the bed fund

10   statute.  The court in that case found, following the

11   *Napolitano* standards, that there was an implied right of

12   action.  Unfortunately, we settled the case before it got

13   to trial, Your Honor.  That's the only case that I'm aware

14   of since many of the other cases which did not find an

15   implied cause of action ever made it to court.  So I'm

16   not -- I am not aware of any at least in the state of

17   Connecticut, Your Honor.

18          THE COURT:  Okay.  That's basically my concern.

19   I think I'm going to have to ask you all to go back and

20   take a look at this issue, to try to figure out if there

21   are any cases that have opined, one way or the other, in

22   the context not of the common law cause of action --

23          MR. MURRAY:  I understand.

24          THE COURT:  -- but of an implied statutory cause

25   of action whether the Court is free not only to imply the

1    cause of action, but then to imply punitive damages remedy

2    and/or an attorneys' fees remedy, unless you have another

3    statutory basis for argument for either of those measures

4    of damages.

5              MR. MURRAY:  I understand the conundrum that

6    Your Honor is in.  You'd like us to do supplemental

7    briefing?

8              THE COURT:  I think I'm going to need

9    supplemental briefing.  Otherwise I'm left to the back-up

10   argument.  The back-up argument is implied causes of

11   action should be treated the same as any common law cause

12   of action.  And if it were common law cause of action,

13   like a breach of contract, obviously you didn't allege and

14   sue under breach of contract here, then you'd say, well,

15   in some instances there may be an award of attorneys' fees

16   or punitive damages, I suppose.  That's what I'm

17   struggling with right now.  That piece is missing in terms

18   of the briefing right now.

19             MR. MURRAY:  Anything else, Your Honor?

20             THE COURT:  I don't think so.

21             MR. MURRAY:  Thank you, Your Honor.

22             THE COURT:  Mr. Blatchley, anything else you

23   want to follow up on?

24             MR. BLATCHLEY:  Two quick points, Your Honor.

25             Your Honor, following up on the chronology of

1    when the notice was given, we touched upon earlier on the

2    July 18 time frame and also July 20.  So I don't think the

3    conduct shows anything.  I don't think it should go to a

4    jury.  I think it's crystal clear that an objective

5    reasonable person would conclude that there was no

6    negligent infliction of emotional distress here.

7            Also on the estoppel argument, my last point,

8    Your Honor, you know, you used the reference "stringing

9    along."  I think that could be aptly used with the

10   simultaneous filing of the CHRO action and the court

11   action in state court and ultimately bringing it to

12   federal court.  That amended complaint was filed

13   November 17, 2016, in the state court.  And the

14   plaintiff's affidavit with the CHRO, which is Exhibit N to

15   the plaintiff's statement of material facts, that was

16   signed January 9.  And that's a verified affidavit that's

17   filed with the CHRO.  At Paragraph 13 it says "Bride

18   Brook's decision to rescind the previous offer of

19   employment was motivated in whole or in part because of my

20   PTSD disability and impairment," yet months before that in

21   the complaint filed with the Court at Paragraph 22, "by

22   refusing to hire the plaintiff because she's a qualified

23   patient, the defendant has violated the law pursuant to,"

24   and the statutory reference to the PUMA statute.

25            I don't know what was going on there.  That

1    information could have been obtained in discovery or

2    request to admit.  But we certainly have two competing

3    very inconsistent bases to refuse to hire the plaintiff in

4    this litigation.  Again, that action is continuing, I

5    think the CHRO issued.

6            Another concern I have is inconsistent rulings.

7    CHRO issued a fact finding hearing in March, it was issued

8    today, received it in the mail today, I think it was

9    noticed March 2nd.  We essentially are going to have a

10   hearing in that administrative action while simultaneously

11   litigating --

12           THE COURT:  If I buy your argument that, well,

13   you know, she's saying two things in two different

14   tribunals, and as a result I deny summary judgment for

15   plaintiff because of a lack of certainty about why she was

16   fired, at a trial plaintiff is going to, I presume, put on

17   evidence that she was fired because she failed the drug

18   test.  Are you going to stand up and say that's not why

19   she was fired, she was fired for the very reason she

20   herself said in CHRO?  Is that what you're going to say?

21   You're not going to say that, right?  You're going to say

22   what she said there was a bunch of malarkey, right?

23           MR. BLATCHLEY:  I think, Your Honor, we'll make

24   the argument or put forth to the jury the inconsistent

25   statements.  It certainly will be credible --

1           THE COURT:  But when the jury gets the case,

2    they're not going to get a verdict form that says:  Has

3    the plaintiff ever been inconsistent?  Is the plaintiff

4    guilty of having litigation strategy?  They're going to

5    have to make a determination of why you fired her, right?

6           MR. BLATCHLEY:  Correct.

7           THE COURT:  Okay.  So it seems to me you're in

8    no position, despite the fact that she may have been

9    inconsistent, to say to the jury, well, the reason she was

10   fired is because of her PTSD.  I would understand your

11   argument if in fact you were going to jump on that horse

12   and ride it, but that's not what you're doing here, it

13   seems to me.  You're just pointing to the inconsistencies

14   saying, well, gosh, there must be a genuine issue of fact.

15   I don't think that's the case, especially given that you

16   couldn't tell me -- and I'm glad you can't tell me -- in

17   good faith you're going to adopt that statement.  That's

18   the concern.

19          MR. BLATCHLEY:  I understand, Your Honor.

20          THE COURT:  My job at summary judgment is to

21   decide if there's a genuine issue of fact, not whether the

22   parties have been inconsistent at some point in time.

23          Anything else?

24          MR. BLATCHLEY:  No, that's it, Your Honor, thank

25   you.

1          MR. MURRAY:  Your Honor, may I?

2          THE COURT:  I have one more question to ask you

3   as well.

4          MR. MURRAY:  Your Honor, I just wanted to

5   represent to you I also got notice over the break about

6   the CHRO scheduling.  The fact finding, quite frankly, I

7   discussed with my client.  We have no interest in probably

8   pursuing that case.  We'll probably be withdrawing it.  So

9   to allay Mr. Blatchley's fear about inconsistent --

10          THE COURT:  You'll probably be?

11          MR. MURRAY:  I mean within the next couple of

12   weeks.  In fact, we could even do it earlier.  To allay

13   Mr. Blatchley's fear, we're not going to have inconsistent

14   rulings and we won't be in two different fora at the same

15   time.

16          THE COURT:  I see.

17          MR. MURRAY:  You had something else to direct to

18   me, Your Honor?

19          THE COURT:  Yes.  Let me look through my notes

20   one moment here.

21              (Pause.)

22          THE COURT:  No, I'm good on that.

23          So what I'd like you to do, I'm going to ask the

24   parties to brief -- I think I'm going to make it two

25   issues here.  The first is the estoppel issue that I spoke

1    about, under what circumstances there might be an

2    estoppel.

3              MR. MURRAY:  And the estoppel issue, Your Honor,

4    goes to because the plaintiff has an alternate pleading in

5    another forum?

6              THE COURT:  Yes.  So that would be the second

7    issue, and the first is the first I described before.

8              And if you could put that briefing in within two

9    weeks, that would be helpful.

10             MR. BLATCHLEY:  Yes, Your Honor.

11             THE COURT:  And letter briefs not to exceed five

12    single-spaced pages.

13             Anything else to take up at this point?

14             MR. BLATCHLEY:  No, thank you, Your Honor.

15             THE COURT:  Thanks for coming in.  Stand in

16    recess.  I'll hold the motion under advisement.  Thank

17    you.

18                  (Proceedings adjourned at 4:27 p.m.)

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4      RE: KATELIN NOFFSINGER v. SSN OPERATING COMPANY LLC

5                      No. 3:16CV1938(JAM)

6

7           I, Diana Huntington, RDR, CRR, Official Court

8   Reporter for the United States District Court for the

9   District of Connecticut, do hereby certify that the

10  foregoing pages 1 through 58 are a true and accurate

11  transcription of my shorthand notes taken in the

12  aforementioned matter to the best of my skill and ability.

13

14

15

16

17                      _____
                               /s/

18                      DIANA HUNTINGTON, RDR, CRR
                           Official Court Reporter
19                      United States District Court
                        141 Church Street, Room 147
20                      New Haven, Connecticut 06510
                            (860) 463-3180
21

22

23

24

25